256 N.J. Super. 629 (1992)
607 A.2d 1030
STEPHANIE ROSEN, BY WAY OF DAVID AND BARBARA ROSEN, PETITIONERS-APPELLANTS,
v.
NEW JERSEY DIVISION OF DEVELOPMENTAL DISABILITIES, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 5, 1992.
Decided May 27, 1992.
*631 Before Judges ANTELL,[1] BAIME and THOMAS.
Herbert D. Hinkle argued the cause for appellants (Herbert D. Hinkle on the brief).
Lisa Marin Main, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel; Lisa Marin Main on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
This appeal involves the efforts of David and Barbara Rosen to secure appropriate residential services for their daughter Stephanie. Stephanie is 35 years old, profoundly retarded and quadriplegic, having the living skills of a totally dependent infant. She is unable to feed herself or care for her own hygiene, dressing or toileting, and cannot grasp objects, move or communicate intelligibly. The Rosens cared for Stephanie at their home until 1985 when she was 28 years old. Because of the parents' physical ailments and age, Stephanie was then placed in a private facility for mentally retarded persons.
In 1989, the Rosens sought the assistance of the Division of Developmental Disabilities (DDD). Under the Developmentally Disabled Rights Act (N.J.S.A. 30:6D-1 through -12) and other statutes, see N.J.S.A. 30:4-25.4, that agency is charged with the responsibility of providing services to persons with developmental disabilities including placement in an appropriate facility. N.J.S.A. 30:6D-9. Instead of pursuing this mission in a meaningful way, the DDD sent the Rosens on a Kafkaesque journey *632 through an endless bureaucratic labyrinth. While we are sensitive to the difficulty of the DDD's task, we find that the administrative agency utterly failed to perform its statutory obligation and that the Rosens should be reimbursed for the financial burden they were required to shoulder.

I.
The facts are not in dispute. Stephanie is severely mentally retarded. She also suffers from spastic quadriplegia, cerebral palsy, chronic inflammation of the kidney and seizures. To alleviate some of these conditions, she is given large quantities of medication on a daily basis. Because she exhibits unexpected reactions to these drugs, her condition must be constantly monitored.
Stephanie is able to move herself only minimally and is thus confined to a specially designed wheelchair. She is prone to various skin illnesses and injuries, including infections, bruises, rashes and pressure sores. Because of a severe scoliosis condition, surgery was performed some time ago, in which her spine was fused. The spinal fusion has made her particularly vulnerable to injury if her body is twisted when moved. Stephanie's orthopedic problems give rise to an extraordinary array of medical difficulties which must be monitored throughout the day. In addition, she has severe, chronic constipation which requires medication and the daily examination of her stools. She is prone to urinary tract and kidney infections, and the amount of fluid intake must be controlled.
As we noted previously, Stephanie's daily living skills are extremely limited. She was unable to perform a single "task" described on the clinical adaptive behaviors inventory, a standardized test developed and used by the DDD to evaluate a client's ability to function. Suffice it to say, she exists at the level of an infant and is totally dependent on others for her care.
*633 Stephanie resided with her parents until they could no longer attend to her needs. The daily regimen of lifting, bathing, feeding, dressing, and moving her through the night totally overwhelmed the family. As described by Mrs. Rosen, Stephanie ultimately became "116 pounds of dead weight."
At age 28, Stephanie was placed at the Melmark School in Berwyn, Pennsylvania, a private facility for mentally retarded persons. The Rosens selected Melmark after visiting many institutions, group and private homes. Recognizing that openings in programs suitable to Stephanie's enormous needs occurred rarely, the Rosens placed her at Melmark as soon as they learned that there was a vacancy. The cost of Stephanie's care, which is presently borne by her parents, is $41,000 per year.
Initially, the Rosens were unaware of the statutorily mandated services provided by the DDD to eligible developmentally disabled persons. After Stephanie's placement, however, the Rosens were informed that several DDD clients had been placed at Melmark and were being cared for at state expense. On January 20, 1989, they applied to that agency for services. Several months later, on April 23, 1989, the DDD intake team found Stephanie eligible, but determined that she was a low priority for residential placement because she was being well cared for at Melmark. The DDD made an initial determination that Stephanie should be placed in a group home, which by regulation is defined as a facility housing four to six clients with "live-in" staff usually located in the community at large. N.J.A.C. 10:44A-1.3.
On May 18, 1989, the Rosens sought review of this determination by the DDD regional office, questioning Stephanie's priority for placement and the appropriateness of a group home. They additionally requested that Stephanie be temporarily maintained at Melmark, the expense to be borne by the state. The regional office rejected the Rosens' objections and agreed with the recommendation of the intake team. Recognizing *634 that it could not foresee a community placement becoming available in the immediate future, the regional office noted that "alternative services have been offered." Despite this cryptic and enigmatic representation, it is undisputed that no services were in fact suggested or provided.
The Rosens sought further review. While their application was pending, the Director of the DDD issued an interoffice communication, stating that for fiscal reasons, no new placements were to be made into the Bureau of Special Residential Services (BSRS), unless (1) the Director had committed to such placement prior to the effective date of the directive, (2) the client can no longer be maintained in his or her current DDD placement and the only alternative is a private institutional placement, or (3) the client's life or safety would be at risk absent placement in a private institution. At approximately the same time, Stephanie's priority level was raised. Under her new priority level, the DDD acknowledged that "extended waiting [would] be detrimental."
John Alan Howard, a DDD administrative review officer, conducted two days of hearings. We briefly describe the evidence presented. Much of the testimony pertained to whether a group home would be adequate in light of Stephanie's condition. The Rosens were skeptical that Stephanie's needs could be met in a group home. They had visited a number of these facilities, and knew of none that were equipped to serve patients as low functioning and medically involved as Stephanie. Further, they thought that the notion of living in a normal community was meaningless in Stephanie's case because she cannot interact or communicate with others. Although the Rosens did not completely rule out group home placement they questioned whether such a course was feasible in the context of Stephanie's needs.
The remainder of the evidence presented at the hearing concerned the actions taken by the intake team. The intake process was described by Dr. Max Mastellone, a DDD staff *635 psychologist who had participated in the review of Stephanie's case. According to Mastellone, an intake worker is assigned to do the field work necessary to determine eligibility and placement. Once the data is collected, a team composed of the intake worker, a psychologist, a nurse and a social worker determines the appropriate level of treatment and services. In this case, Clifford Anderson was the only member of the team to have seen Stephanie. The team members have the discretion to meet the client themselves, but in this case the team chose to rely upon Anderson's observations and the records he collected.
Mastellone testified that the team viewed Stephanie as a low priority for residential placement since she was "well taken care of" at Melmark. Therefore, the team recommended placement on a waiting list for group home placement. Mastellone admitted that very few group homes accept people in wheelchairs and he did not know if any of these homes served profoundly retarded people. Nevertheless, group home placement was selected for Stephanie because the team viewed this as the "least restrictive alternative." When asked to name a practical benefit that Stephanie would receive from leaving Melmark to live in a group home, Mastellone said he could think of none.
Jo Ann Riesz, the social worker on the intake team, testified that she did not regard Stephanie's case as presenting exceptional placement difficulties. She nevertheless added that she was aware of only one group home that would serve non-ambulatory people, but did not know whether it accepted severely retarded people or whether it had a vacancy. Riesz acknowledged that Melmark was an appropriate alternative for Stephanie until a group home became available. However, she noted that the team never considered recommending Melmark as an interim placement.
Similar testimony was elicited from the other members of the intake team. Mary Connelly, another social worker, testified that she thought there was one group home in her region that *636 could meet Stephanie's needs but did not know of a vacancy. She agreed with the others that Melmark was currently providing Stephanie with appropriate care. Lorraine O'Neil, an LPN, testified that Melmark was meeting Stephanie's nursing requirements, but that those needs could also be met in either a group home or a state developmental center. However, she testified that she knew of no non-ambulatory group home with a vacancy.
Dr. Albert Brown, the assistant regional administrator who had reviewed the intake team's recommendations when the Rosens invoked the appeal process, also testified. Brown stated that he supported the recommendation of placement in a group home, although he did not know if any of the facilities in his region could accommodate someone as severely disabled as Stephanie, or whether any program that might be appropriate had a vacancy. Although Brown had visited Melmark in the past in connection with other DDD clients, he was not familiar with Stephanie's program and had never seen her.
Anderson was more outspoken than the rest of the DDD intake team. He testified that when the team conferred, and again when Brown met to review its decision, no one knew of a group home that could meet Stephanie's needs, but they recommended such placement anyway. It was Anderson's impression that the team did not want to take responsibility for recommending a private placement and thus left that decision to people outside the regional office  in Trenton. Anderson disagreed with this approach because if the team made no recommendation concerning Melmark, Trenton would have no way of knowing that it was being called upon to render a decision as to the appropriateness of that facility. In any event, as we noted earlier, Anderson was the only DDD staff member to visit Stephanie.
Anderson testified that he saw Stephanie at her parent's home, but did not have an opportunity to visit Melmark. He indicated that Stephanie could be accommodated in a specialized *637 group home, although he doubted that one existed. He also testified that Stephanie's need for "self-care skills, bathing, dressing [and] toileting" could be met at a developmental center as well as at Melmark. However, he did not comment upon whether Stephanie's training needs could be met in a developmental center or whether such placement would maximize her developmental potential. The only witness for either side to address this question was Dr. Lewis Alban, a clinical psychologist.
Alban testified that, because of Stephanie's severe physical problems, even a specialized group home would be unlikely to meet her needs. So too, a developmental center would be inadequate and overly restrictive. Alban concluded that Melmark offered the best program available to care for Stephanie's problems.
Howard's findings were issued on September 4, 1990. Based upon the evidence we have described, Howard determined that the DDD had been "arbitrary in its application of unsubstantiated policies." He urged that Stephanie be reevaluated for the highest placement priority, "urgently in need." Howard also concluded that the agency had not offered the "most appropriate service" or an "alternative service" as required by N.J.S.A. 30:4-25.6. However, he declined to order placement at Melmark because the availability of other options had not been resolved.
The Director issued a written decision on October 15, 1990. He agreed with Howard's recommendation that placement be accorded top priority. He also found that the Rosens were unable to care for Stephanie at home. The Director ordered that an "individualized habilitation plan" (IHP) be completed within 30 days to identify the most appropriate service for Stephanie. He also directed that the IHP delineate the most appropriate alternative service in the event the recommended permanent placement was not available.
An IHP was prepared pursuant to the Director's order. However, the IHP was vague in certain particulars. Although *638 it identified the types of services that were necessary, it did not make any recommendation respecting a permanent or alternative placement. Instead, the IHP stated that if Stephanie were to be placed in a group home, it must be one that is highly specialized to meet her all-encompassing needs. The DDD staff is quoted in the IHP as suggesting that its members were under orders from their superiors not to recommend placement at Melmark despite whatever thoughts they might harbor concerning its appropriateness.
On January 2, 1991, an addendum was made to the IHP, indicating that the DDD recommended an institutional placement at an unidentified developmental center. The addendum was silent respecting when and where the placement would be made. In response to the Rosens' objections and requests for further information, on February 20, 1991, the Director notified them of his intent to place Stephanie in an "intermediate care facility for the mentally retarded" (ICF/MR). However, no specific institution was recommended or suggested.
Because the Director's response was as unspecific and indefinite as the DDD's initial recommendation in 1989, the Rosens filed a direct appeal to this court. In addition, the Rosens continued to seek further and more specific information concerning where and when Stephanie was to be placed and what alternative services would be provided in the interim. On April 17, 1991, the Director notified the Rosens that Stephanie would be admitted to the Vineland Developmental Center within 180 days. Vineland is a 1200 bed facility located on two separate campuses. Different treatment and service modalities are provided depending upon the needs of the client. The Director's placement of Stephanie at the Vineland facility did not specify any particular treatment modality or program. In any event, the placement at Vineland never materialized. Two days before oral argument, we were advised by the DDD that the placement at Vineland had been canceled. Instead Stephanie is now to be placed at the New Lisbon Developmental Center.
*639 In the Rosens' brief, they contend that (1) the DDD should have placed Stephanie at Melmark in order to maximize her developmental potential in a manner least restrictive of her personal liberty, (2) the Director's decision to place Stephanie in the Vineland developmental program was arbitrary and capricious, (3) because no permanent placement became effective and no alternative services were provided, the Rosens should be entitled to reimbursement, (4) the dispute should have been treated as a "contested case" and referred to the Office of Administrative Law, (5) inadequacies in discovery resulted in an administrative hearing which was fundamentally unfair, and (6) the DDD should bear the burden of proving the appropriateness of its placement.
At least to some extent, the latest development, the DDD's cancellation of Stephanie's placement at the Vineland facility and its decision to place her in the program at New Lisbon, moots several of the questions originally presented. Although there is reason to believe that several of these issues might recur, we are persuaded that the interests of justice do not call for their immediate resolution here. Instead, we consider only three of the questions presented. We hold that the DDD failed to perform its statutory duties under the Developmentally Disabled Rights Act and related statutes by not placing Stephanie in an appropriate facility or offering alternative services. We further conclude that the Rosens are entitled to reimbursement for funds expended by them to provide the services that should have been performed by the DDD. Finally, we believe it consistent with the statutory scheme and the Legislature's abiding concern for the welfare of developmentally disabled persons that the burden be placed on the DDD to establish the appropriateness of a contested placement.

II.
We first examine the various statutes applicable to developmentally disabled persons. Our discussion begins with the *640 Developmentally Disabled Rights Act. The cornerstone of that statutory scheme is the Legislature's mandate contained in its findings and declarations, that developmentally disabled persons are to be provided with services "in a manner which respects [their] dignity, individuality and constitutional, civil and legal rights...." N.J.S.A. 30:6D-2. These services are to include "specialized" modalities or "special adaptations of generic services ... directed toward the alleviation of a developmental disability...." N.J.S.A. 30:6D-3b. Admissions to "public or private agency" facilities is expressly provided when needed. N.J.S.A. 30:6D-3c. In ringing language, the Legislature has directed that "[e]very service for persons with developmental disabilities offered by any facility shall be designed to maximize [their] developmental potential and shall be provided in a humane manner [and] in a setting ... which is least restrictive of each person's personal liberty." N.J.S.A. 30:6D-9. To advance this policy, an "individualized habilitation plan" is to be prepared with respect to each eligible developmentally disabled person, N.J.S.A. 30:6D-10, and is to include a statement of long-term habilitation goals and intermediate objectives, N.J.S.A. 30:6D-11a, a description of how these objectives can be achieved, N.J.S.A. 30:6D-11b, an identification of appropriate evaluative criteria, N.J.S.A. 30:6D-11c, and a specification of the service to be provided, N.J.S.A. 30:6D-11e.
Among other things, N.J.S.A. 30:4-25.1 through N.J.S.A. 30:4-25.8, describe additional obligations of the Department of Human Services respecting the services to be provided to mentally retarded persons. "[I]mmediately upon determination of the state of mental retardation," the Commissioner or his designate must report his findings to the applicant. N.J.S.A. 30:4-25.4. In the event the applicant is found to be eligible, the Commissioner or his designate is to apprise him of that fact and "advise the applicant of the particular functional service deemed most appropriate for [his] training, habilitation, care and protection...." Ibid. The applicant is to be informed of "the immediate availability of such services, or alternative *641 services." Ibid. N.J.S.A. 30:4-25.6 directs the Commissioner to "forthwith admit the eligible mentally retarded person, and provide him with appropriate functional service to the extent available." Recognizing the scarcity of adequate resources, this section mandates that if the most appropriate functional service is not available, "the [c]ommissioner shall provide alternative service" and place the "eligible mentally retarded person on a waiting list" for the "preferred" facility. Ibid.
The Legislature has granted significant latitude to the Commissioner to manage and marshall the Department's limited resources. The decision as to the type and availability of services that any DDD client receives is statutorily allocated to the Commissioner in N.J.S.A. 30:4-25.4. See Mr. and Mrs. J.E. v. State DHS, 253 N.J. Super. 459, 467, 602 A.2d 279 (App.Div. 1992). Pursuant to N.J.S.A. 30:1-11, the Commissioner is explicitly given the discretion to determine the specific type of services that a client will receive. The recipient has no right to choose the service he or she prefers. Mr. and Mrs. J.E. v. State DHS, 253 N.J. Super. at 467, 602 A.2d 279. Nevertheless, we stress that it is incumbent on the Commissioner to provide "appropriate" functional services, and, if they are unavailable, to provide "alternative" services. N.J.S.A. 30:4-25.4. Our courts have previously recognized the Legislature's strong moral and legal commitment to care for the mentally retarded, see N.J. Ass'n for Retarded Citizens v. Human Services, 89 N.J. 234, 249, 445 A.2d 704 (1982); Levine v. Department of Institutions and Agencies of New Jersey, 84 N.J. 234, 249, 418 A.2d 229 (1980), and we reaffirm our obligation to insure fair execution of the statutory mandate.

III.
Against this backdrop, we find that the DDD did not perform its statutory duties. Examination of the record impels the conclusion that the DDD offered neither an appropriate placement nor alternative services.
*642 In reaching this conclusion, we recognize that we must not substitute our judgment for that of the administrative agency. See Clowes v. Terminix Intern., Inc., 109 N.J. 575, 587, 538 A.2d 794 (1988). Our role is to determine whether there is sufficient credible evidence in the record to support the agency head's conclusion, Ibid.; see also Goodman v. London Metals Exchange, Inc., 86 N.J. 19, 28, 429 A.2d 341 (1981); Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965), and whether the decision reached was arbitrary or capricious, see New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 563, 384 A.2d 795 (1978). If there is "any fair argument in support of the course [taken by the agency] or any reasonable ground for difference of opinion among intelligent and conscientious officials," we are obliged to affirm. Flanagan v. Civil Service Dept., 29 N.J. 1, 12, 148 A.2d 14 (1959). We also acknowledge our responsibility to defer to the expertise of the administrative agency charged with the duty of implementing the legislative plan. Clowes v. Terminix Intern., Inc., 109 N.J. at 587, 538 A.2d 794. This principle has particular efficacy in a case such as this where we deal with an issue involving increasing social demands on limited public resources. Of course, "[w]e hold no roving commission to determine how public moneys are to be expended." Maticka v. City of Atlantic City, 216 N.J. Super. 434, 457, 524 A.2d 416 (App.Div. 1987) (Baime, J.A.D., concurring). As judges, we do not "have a monopoly on justice." Id. at 457-58, 524 A.2d 416. Instead, "[w]e share it with many, and not just the Legislature and the Executive." Dougherty v. Human Services Dep't, 91 N.J. 1, 10, 449 A.2d 1235 (1982). "We share it also with administrators whose task is often a lot more difficult than ours." Ibid.
This much conceded, our concern here is not so much with an agency decision, but rather with a non-decision. Despite a plethora of utopian plans, the fact remains that Stephanie was never offered appropriate functional services or alternative services, as required by statute. The initial recommendation of the intake team that Stephanie be placed in a group *643 home, which was affirmed and reaffirmed as the case proceeded along its journey through the bureaucratic maze, was essentially meaningless. To our knowledge, no specific group home was ever identified as being able to meet the needs of the client. It was not enough for the DDD to conjure up some idealized, but non-existent, group facility which could provide appropriate care. The object was, and continues to be, to find a facility that can accommodate Stephanie's complex needs.
Nor were the DDD's subsequent placement recommendations adequate. Clearly, the IHP that was prepared pursuant to the Director's order did not satisfy the statutory requirement. As we noted earlier, it was entirely silent on the subject of placement. The addendum of January 2, 1991 was equally meaningless. It will be recalled that the addendum recommended an institutional placement at an unidentified developmental center. The addendum was devoid of any information with respect to where and when the placement would be made. Finally, the Director's letter of February 20, 1991 in which he suggested that Stephanie be placed in an unnamed "intermediate care facility" added nothing to what the Rosens already knew. Again, no specific institution was recommended or suggested.
After this appeal was filed, the Director notified the Rosens that Stephanie would be placed in the Vineland facility within 180 days. As we pointed out, however, this institution is a 1200 bed facility located on two separate campuses. No specific program or placement within the institution was recommended. In any event, that placement never materialized.
It is equally plain from the record that no offer of alternative services was ever made. Instead, the DDD was content to have Stephanie remain at Melmark, at the Rosens' expense. We have no doubt that the Rosens wished to have Stephanie remain at Melmark. To this day, they continue to harbor this desire. However, the record does not support the DDD's claim that the Rosens were obstructive or unreasonable in their demands. They had a problem and they wanted a solution. *644 We are satisfied that the DDD's failure to provide alternative services was not rooted in the Rosens' recalcitrance.

IV.
We hold that the Rosens should be reimbursed for the funds expended by them following the DDD's declaration of eligibility. We recognize the "considerable strain placed upon the [DDD] by the lack of sufficient money and other resources to service the needs of its actual and potential constituency." T.R. v. Div. of Dev. Disabilities, 249 N.J. Super. 77, 83, 592 A.2d 13 (App.Div. 1991). We have been told that there is a substantial backlog of cases and a waiting list for DDD's services. We are nevertheless convinced that the DDD will best serve its function by determining the nature of the services required in accordance with the standards mandated by statute. Ibid.
The remedy provided here is consistent with that granted by our Supreme Court in Lascari v. Board of Educ., 116 N.J. 30, 49-53, 560 A.2d 1180 (1989). There, the Board of Education failed to provide an appropriate education to a handicapped child, necessitating his parents placing him into a private residential school. Although the Court determined that the parents' right to reimbursement was grounded in statute, Id. at 49, 560 A.2d 1180, that course was also said to be consistent with compelling equitable considerations, Id. at 51, 560 A.2d 1180.
The equitable considerations cited by the Court in Lascari are equally applicable here. See T.R. v. Div. of Dev. Disabilities, 249 N.J. Super. at 83, 592 A.2d 13. In fact, they weigh more heavily in favor of the Rosens. In Lascari, the parents were faced with the dilemma of choosing between an inappropriate, free public education or providing their child with an appropriate education at their own expense. Here, the Rosens had no choice. They could no longer attend the needs of their daughter. Instead, they were forced to place her in an institution which they regarded as suitable for her condition. Nothing *645 in the record suggests that their determination was unreasonable or that a less costly appropriate placement was available.
Under these circumstances where the DDD totally defaulted in its obligation to provide permanent placement or alternative services, we regard reimbursement as the only just remedy.

V.
We have saved the procedural point for last. The Rosens contend that the burden should be placed on the DDD to establish the appropriateness of its recommended placement. We agree.
In our view, the deficiencies in the administrative proceedings in this case, as we have described them, evidence the need to place the burden on the DDD. We hold that whenever there is a serious objection to a placement the DDD personnel proposing the service has the burden of establishing its appropriateness in the course of the various internal hearings conducted by that agency. We recognize that these are not contested cases and that an applicant has no right to a particular service or placement. Mr. and Mrs. J.E. v. State DHS, 253 N.J. Super. at 468-69, 602 A.2d 279. However, where the applicant raises a serious question concerning the advisability of a proposed placement, the administrators should be required to establish the appropriateness of the course they recommend in the informal hearings conducted within the DDD.
This result is consistent with the proposition that the burdens of persuasion and production should be placed on the party better able to satisfy them. In other areas, our courts have placed either the burden of production, see Ryan v. Mayor & Council, Borough of Demarest, 64 N.J. 593, 604-05, 319 A.2d 442 (1974), or the burden of proof on the party with the better access to relevant information, see Andersen v. Exxon Co., 89 N.J. 483, 500, 446 A.2d 486 (1982). With its recourse to intake teams and other experts, the DDD has ready access to the *646 expertise needed to formulate an IHP. In contrast, applicants who question the DDD's recommendations have limited discovery rights and less access to relevant information concerning appropriate and available alternative functional services. See Mr. and Mrs. J.E. v. State DHS, 253 N.J. Super. at 468-69, 602 A.2d 279.
Other considerations lead us to the same conclusion. We deem it more consistent with the statutory scheme to place the burden on the DDD to show the appropriateness of its recommended services. Underlying the Developmentally Disabled Rights Act and other statutes is an abiding concern for the welfare of the developmentally disabled and their families. Consistent with that concern, the Legislature has taken pains to identify and safeguard the rights of the mentally retarded. Allocation of the burden of proof in the manner we have directed is consonant with the Legislature's clearly articulated objectives.
We do not think that it is asking too much to require the DDD to carry the burden of proof. As we noted earlier, the limited scope of our review powers remains, and is sufficiently protective of the interests of the DDD. Moreover, placing the burden on the DDD tends to promote the creation of a complete record for appellate review.
We note that similar considerations were said by our Supreme Court to mandate placing the burden of proof on the board of education to establish the appropriateness of a placement or change of placement. See Lascari v. Board of Educ., 116 N.J. at 44-46, 560 A.2d 1180. Although Lascari is not precisely on point, the result we reach here is consistent with the Court's holding.

VI.
An enlightened society does not "set people adrift because they are the victims of misfortune." N.J. Ass'n for Retarded Citizens v. Human Services, 89 N.J. at 252, 445 A.2d 704. The *647 Legislature has mandated governmental intervention to insure that the rights of the developmentally disabled be safeguarded. The underlying thesis is that human life, whatever its quality, is inherently precious and deserving of protection. This is a noble idea, but one that requires a substantial commitment of resources and effort in its effectuation. The DDD failed to fulfill its statutory mission in this case. We order that the Rosens be reimbursed and remand to the DDD for further proceedings consistent with this opinion.
NOTES
[1] Judge Antell did not participate in oral argument. However, the parties consented to his participation in the decision subsequent to argument.