626 A.2d 466

S.I., BY WAY OF G. AND S.I., PETITIONERS–APPELLANTS,
v. NEW JERSEY DIVISION OF DEVELOPMENTAL
DISABILITIES, RESPONDENT–APPELLEE.

Superior Court of New Jersey
Appellate Division

Argued April 21, 1993—Decided June 9, 1993.

Before Judges KING and LANDAU.

*Herbert D. Hinkle* argued the cause for appellants.

*Lisa Marin Main*, Deputy Attorney General, argued the cause for appellee (*Robert J. Del. Tufo*, Attorney General, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel, and *Ms. Main*, on the brief).

The opinion of the court was delivered by

LANDAU, J.A.D.

This appeal raises questions about the extent and nature of the services or financial relief to which S.I. and her parents, G. and S.I. (Petitioners) are entitled from and after the date when S.I. was declared eligible for services by the New Jersey Division of Developmental Disabilities (Division). We address this question in light of the mandate of the statute, *N.J.S.A.* 30:4–25.6 and recent case law, but mindful of our obligation to respect constitutional limitations upon judicial exercise of executive or legislative powers. Although unargued, the record submitted requires that we address, too, a clear indication that the Division's prioritization and placement standards, heretofore promulgated by Circular and other informal methods of publication, should comply with the

requirements of the Administrative Procedure Act, *N.J.S.A.* 52:14B-1 to 15.

## Background

S.I. is a 32 year old mildly retarded, developmentally disabled woman. In 1976 her parents placed her in the Bancroft School located in Haddonfield, N.J. She was subsequently transferred to Bancroft's Voorhees Transitional Program, at a supervised townhouse apartment located in Voorhees, N.J. Except for a two-year period when funding was provided by a local school district, S.I.'s parents have paid for the cost of her programs.

Pursuant to *N.J.S.A.* 30:4–25.2, 30:6D–25(b) and *N.J.A.C.* 10:46–1.1 to 4.2, S.I. was determined eligible for services by the Division on April 11, 1988. The Division placed her on the waiting list for placement in a Division supervised apartment under the category of "Urgency Level III", (Can benefit from placement; waiting is not detrimental).[1] She remained in Bancroft at Petitioners' ex-

---

[1] The Division has informally adopted a policy embodied in "Division Circular # 8" in which it prioritizes the placement of eligible applicants. The Circular entitled "Management of Waiting Lists for Community Services" is part of the record. It provides, in part, that, "Clients shall be categorized and notified in accord with the agreement entered into on May 17, 1985 between the Division and the Public Advocate," and that, "If an eligible client cannot be admitted to the preferred service, he/she shall be offered appropriate alternate services."

The May 17, 1985 "agreement" is a best-effort undertaking by the Division, entered with and at the instance of the Public Advocate, which recognized six categories of priority on a Division waiting list for provision of residential services and looked to its diligent monitorship and elimination of the three highest categories of the list by July 1, 1987. It was recognized that, "Although the Division cannot commit to placements for which the Legislature has not appropriated funds, the Division will demonstrate its intent to fully implement the agreement by asking for the necessary resources in the fiscal year '87 budget request."

These documents and internal Division communications of record make plain that the objectives of the 1985 agreement were not met at the time of S.'s determination of eligibility in 1988, nor indeed since. The waiting list for residential service apparently remains large. We discern from the record what amounts to a Human Services triage system, after the medical model,

pense. Petitioners then requested financial assistance from the Division and appealed the Urgency Level III designation.

In response to these requests, an Informal Conference was held on October 12, 1988 pursuant to *N.J.A.C.* 10:48–1.3. It was agreed that Petitioners would defer action on their appeal until the agency had an opportunity to show them several supervised apartments, other than Bancroft. However, the Division did not show Petitioners any supervised apartments, offer financial assistance, nor provide a specific primary or alternative placement plan for S.I.

On April 27, 1989, Petitioners again asked for assistance in funding S.I.'s placement at Bancroft or, in the alternative, for an offer of a suitable alternative program. On June 21, 1989 the Division announced its reversal of S.I.'s eligibility determination because her parents did not reside in New Jersey. The Petitioners appealed and an OAL judge decided in favor of the Petitioners holding that, even though S.I. had been declared incompetent, the long period of Bancroft residency qualified her as a New Jersey resident, notwithstanding her parents' Pennsylvania domicile. This OAL opinion on March 6, 1990 was rejected by the Division Director who remanded the matter for further fact finding. Following an OAL hearing in June, 1990, but prior to the decision, the Division conceded S.I.'s New Jersey residency and the issue is not here presented.

S.I. was then reinstated as a client of the Division and again classified at Urgency Level III. Once more, Petitioners appealed this classification and requested placement, with retroactive funding, at Bancroft or in some other suitable program. As a result of an Informal Conference held on February 13, 1991, S.I.'s priority was changed from Urgency Level III to Level II (extended waiting for residential services would be detrimental). In addition, the Division invited the Petitioners to visit specific supervised

---

created by agreement, circulars and internal administrative policy, and continued under the penumbra of chronic fiscal exigency.

apartment programs. These programs, however, were found inappropriate for S.I. by both the parents and the Division case manager.

On March 8, 1991, Petitioners appealed the Informal Conference decision, contending that S.I.'s status should be changed to Urgency Level I and that the Division should fund her placement at Bancroft as an alternative service retroactive to the initial date of her eligibility.

The matter was determined by the Director to be "noncontested" pursuant to *N.J.A.C.* 10:48–1.6 [2]. An extended Administrative Review Conference (ARC) was held on August 21 and 23, and October 2 and 6, 1991, in which evidence was received.

### The ARC Evidence

Mary Jean Gender testified she was S.I.'s educator at Bancroft for 3½ years, and worked with a team of educators to develop programs for her. According to Gender, S.I. shares with two other young disabled women a three or four bedroom townhouse in an environment in which some houses are occupied by Bancroft residents and others by typical residential lessees.

S.I. is employed at two part-time jobs, and can do her own banking and shopping. However, Gender testified that S.I. frequently destroys property, especially items of clothing. When frustrated, she can harm herself, as exemplified by a recent self-biting incident. This unpredictability requires that she not be left alone for an extended period of time.

S.I.'s father, G., testified. He is a dentist. He and his wife placed S.I. in Bancroft at her request when she was 16 years old. During a four month period when S.I. stayed home with her parents, she needed constant supervision. G.I. said that S.I. was often destructive and that she struck him once.

---

[2] See comments *infra* at pp. 259–260, 626 *A.2d* at p. 470, respecting the effect of *Mr. & Mrs. J.E.*, 131 *N.J.* 552, 622 *A.2d* 227 (1993).

G. also testified that, at 61 years of age, he now suffers from an arthritic condition, and so would like to retire from dentistry practice but cannot because the cost for S.I.'s placement at Bancroft is approximately $50,000 a year.

Dr. Alban, a clinical psychologist, testified that he met with S.I. on two occasions. He described S.I. as brain damaged and mildly retarded, posing a danger primarily to herself. She is disturbed by inconsistency, unreliability or unpredictability, and requires a high degree of consistency to foster appropriate behavior and responses. S.I. requires extensive supervision throughout the day and at night. In light of these needs, S.I. would regress if she were returned to her home environment and would become harmful to herself or others.

Barbara Chester, a Principal Community Program Specialist, testified on behalf of the Division. She said that the particular residence in which S.I. was placed by Bancroft was not currently licensed and that the Division would not place clients in unlicensed residences. Where a client is found to reside at an unlicensed facility, the proper course of action would be for the Division to remove the client or ask the facility to apply for a license. To her knowledge, this had not been done. Chester also testified that existing Division directives stringently limited private placements.

Lee Berkey, Special Assistant to the Director, explained that it was the Division's policy to rely on purchase of care only when already budgeted in-house resources could not meet unique individual needs. Purchase of care resources were contracted through agencies such as Bancroft for individuals who were not or could not be accommodated in the Division's budgeted programs. Berkey testified that the Division is obligated to remain within its budget ceiling while providing services to its clients. There was a ceiling for purchase of care placements, although in an emergency, money for purchase of care could sometimes be freed up.

The Assistant Regional Administrator, Albert Brown, testified that he up-graded S.I.'s Urgency status from Level III to Level II because she was not making the kind of progress that she would if

she had been recommended for placement by the Division team. In determining that S.I. did not meet the Urgency Level I standard, Brown utilized the criteria outlined in Division Circular 8. He looked to the services that S.I. was then receiving at Bancroft in order to determine whether she was urgently in need and should be given higher priority.

Paul Williams, S.I.'s case manager, testified that the only services the Division provided for her since 1988 was a yearly case management review. Although he was initially directed to show programs to the Petitioners in 1988, he did not then do so because of the litigation concerning S.I.'s residency status.

In early 1991, Williams took the Petitioners out to observe two programs, but he subsequently determined that neither would meet S.I.'s needs. A referral was made to Atlantic A.R.C., which had one vacancy in the Division's supervised apartment program. The Atlantic agency requested an interview, but prior to its scheduling, the vacancy was filled. The case manager had not offered nor shown the Petitioners any other programs as of the hearing date.

### The Administrative Determination

Following the hearing, the Administrative Review Officer ("Officer") issued an opinion with findings recommended for approval and implementation by the Director. He found that lack of licensure for S.I.'s apartment site precluded a recommendation that the Division fund S.I.'s placement there, and that the administrative decision to fund private placement only in very exceptional circumstances was a legitimate agency prerogative. The Officer determined that there was no extreme urgency under the Division Circular # 8 standards because S.I. was in fact then residing at Bancroft, and that the threat of regression by having to return to her parents' care was speculative.

The Officer further found that the Division need not fund S.I.'s placement at Bancroft, but that some "imminent relief is indicated". He recommended that the Division develop and have in place

a transfer "individualized habilitation plan" (IHP) no later than 30 days from the final decision of the Division Director. Furthermore, he recommended that the Division place S.I. into a supervised apartment no later than December 31, 1992 with actual admission to occur no later than June 30, 1993.

The Director's decision issued on January 24, 1992 substantially adopted the Officer's findings and recommendations. He assigned S.I. to "Waiting List Category Urgency I, effective January 24, 1992." However, he noted that the decision did not mean that the earlier assignments to Urgency II and III were incorrect. At oral argument before the Court, it was explained that the increasing age and potential disability of G.I., rather than any change in S.I.'s condition, primarily prompted the upgrade to Category I.

The Director ordered that an IHP, identifying appropriate services and alternative services, was to be developed within 30 days of the decision. He also directed the Division to assign a specific placement for S.I. by December 31, 1992 and place her no later than June 30, 1993. This was consistent with the Division's plan for all persons assigned Urgency I category after May 17, 1990.

Citing *N.J.S.A.* 2C:30–4, the Director stated that S.I.'s placement at Bancroft could not immediately be paid for because all funds available for the then current fiscal year had been committed. No retroactive reimbursement was ordered. Another reason specifically given was Bancroft's lack of licensure. The Director noted that S.I.'s facility at Bancroft was not inspected until November 26, 1991 and its licensure was not valid until that date.

The Division has represented that by reason of additional legislative funding, S.I.'s Bancroft placement costs will be reimbursed retroactive to July, 1992. The Division will maintain S.I.'s placement at Bancroft until its own supervised apartment placement can be developed.

Thus, Petitioners' reply brief has concisely stated:

Now that DDD has placed S.I. retroactively at Bancroft, much of the case appears moot. There remains only the question of how far back retroactive placement should extend—to July 1, 1992 as the DDD maintains or 1988 as the I.'s maintain.

We approach this appeal, now focused on the question of retroactive reimbursement, in light of recent authority and mindful of the limitations upon judicial intrusion into matters committed to legislative or executive action. However, resolution of the reimbursement question compels attention to the Division's prioritization and placement determinations.

### Retroactive Reimbursement

On April 7, 1993, shortly before oral argument herein, the Supreme Court decided *Mr. & Mrs. J.E. on behalf of their son, G.E. v. State of New Jersey*, 131 *N.J.* 552, 622 *A.*2d 227 (1993). There, informal Administrative Review procedure had been employed by the Division on an appeal by parents from change in placement of their developmentally disabled son from a purchase of care arrangement to an "in-house" Division placement at the New Lisbon Developmental Center.

The Court reaffirmed the statutory guarantee that eligible disabled persons must be given the most appropriate placement available that best can enhance their developmental potential in the least restrictive environment. *N.J.S.A.* 30:6D–9. This right to service, concluded the court, is a legitimate property interest entitled to due process protections, and thus an eligible person's placement dispute involving analogous issues and interests must be referred to the Office of Administrative Law for a trial-type hearing under the Administrative Procedures Act. In such a hearing, the Division must bear the burden of proving that its placement decision satisfies the service recipient's legal entitlement. *Id.* at 568–570, 622 *A.*2d 227.

Shortly after *Mr. and Mrs. J.E.* was decided, the Division itself moved in this Court for immediate remand to the OAL because (1) the appellant's have consistently contended, and the Division now concedes, that the previous limited hearing procedure did not offer

the appellant's adequate due process in light of *Mr. and Mrs. J.E.*; (2) the Supreme Court has placed the burden of proof upon the Division to justify its placement decisions.

The Petitioners opposed remand, arguing that the present record is sufficient to support reimbursement retroactive to 1988, particularly in light of the shift in burden of proof.

We denied the Division's motion, preferring to consider the remand option after addressing Petitioner's appeal and demand for retroactive payment.

*Mr. & Mrs. J.E.* teaches that "eligible developmentally-disabled citizens possess a legitimate property interest in the receipt of services. The scope of that interest is defined by the qualitative standards that govern the provision of services to the developmentally disabled. *N.J.S.A.* 30:4–24.2, 30:4–25.6, 30:6D–9, and *N.J.A.C.* 10:47–6.2." *Mr. & Mrs. J.E., supra,* 131 *N.J.* at 565, 622 *A.2d* 227 (slip op. at 16). The Developmentally Disabled Rights Act provides that, once determined to be eligible, developmentally disabled persons have a right to services to maximize their developmental potential. *N.J.S.A.* 30:6D–9. *N.J.S.A.* 30:4–25.6 specifies that once a person is determined to be eligible for services, the Division must provide that person "with appropriate functional service to the extent available." If the appropriate functional service is not immediately available, the statute requires the Division to provide alternative service and, if the applicant requests it, to place the eligible person on a waiting list for the more appropriate service. *Ibid. See also, Rosen by Rosen v. New Jersey DDD,* 256 *N.J.Super.* 629, 640–41, 607 *A.2d* 1030 (App.Div. 1992), *certif. den.,* 133 *N.J.* 440, 627 *A.2d* 1145 (1993).

Under the statute, the Division must make "all reasonable and necessary provisions to ensure the health, safety, welfare and earliest appropriate release" of its clients and must provide for each client's educational, medical, dietetic and social needs, according to his or her individual requirements. *N.J.S.A.* 30:4–25.7.

In the present case, following determination of her eligibility in 1988, S.I. was placed on a waiting list for the most appropriate service but, apart from some prospective site exploration, no alternative service was provided. Petitioners contend that they are entitled to reimbursement of the amounts paid for S.I.'s placement at Bancroft since the eligibility determination,[3] and not merely retroactive to July, 1992.

Petitioners note that several recent decisions of this Court ordered retroactive reimbursement. In *T.R. v. Developmental Disabilities Div.*, 249 *N.J.Super.* 77, 83, 592 *A.2d* 13 (App.Div. 1991), the Division determined, incorrectly, that a developmentally disabled person was not eligible for Division services because he was also mentally ill. Financial reimbursement was ordered, ostensibly under the authority of *Lascari v. Bd. of Educ.*, 116 *N.J.* 30, 53, 560 *A.2d* 1180 (1989). In *Rosen by Rosen v. New Jersey DDD*, 256 *N.J.Super.* 629, 644–45, 607 *A.2d* 1030 (App.Div.1992), *certif. den.*, 133 *N.J.* 440, 627 *A.2d* 1145 (1993), a case involving a profoundly disabled young woman, we held that equity required reimbursement because the Division determined Stephanie Rosen eligible for DDD services but failed to provide her with either the most appropriate placement or an alternative, in circumstances which can only be described as egregious. The Rosens had been paying for Stephanie's care at a private out-of-state institution. *Id.* 256 *N.J.Super.* at 633, 607 *A.2d* 1030. Stephanie was severely mentally retarded, confined to a specially designed wheelchair and had serious, chronic, physical and medical problems. The Division determined that the most appropriate placement for her was at a group residential home, but identified no specific home. She was placed on the waiting list.

---

[3] According to the Division's supplemental appendix, approximately 3,000 developmentally disabled New Jersey residents have been determined to be "eligible" and placed upon the Division's waiting list for service, in five levels of urgency. *See also*, Caryl R. Lucas, *Families Plead for More Help in Caring for Disabled Loved Ones, The Star–Ledger* (Newark), March 26, 1992, at 29.

We found this placement recommendation "meaningless," observing that the Division did not meet its statutory mandate by conjuring up an "idealized, but non-existent, group facility." *Id.* at 643, 607 *A.*2d 1030. The Division's later vague mention of an "intermediate care facility" and possible placement in Vineland Developmental Center were similarly inadequate to constitute an offer of alternative services under *N.J.S.A.* 30:4–25.6. In those circumstances we held that for the Division's failure to satisfy its statutory responsibility, reimbursement was "the only just remedy." *Ibid.*

Despite some similarities in *T.R., supra,* and *Rosen, supra,* with the present case, most notably recognition of client eligibility without provision of service by the Division, we do not read either case to mean that retroactive financial reimbursement is automatically mandated if neither an optimal nor alternative service has been provided immediately upon the eligibility determination. In *Rosen,* where the disability was so palpably critical as to leave no room for question as to arbitrariness and unfairness of the Division's actions, we found an inherent equitable basis for ordering reimbursement, but recognized that *Lascari*'s order of reimbursement was grounded in authority provided by 20 *U.S.C.* Sec. 1415(e)(2). There is no comparable authority in Developmental Disability legislation.

Thus, the reimbursement issue is not a mere question of discretion. We view *Rosen* and *T.R.* as cases involving such manifestly mistaken or arbitrary placement classification as to have made unnecessary any further inquiry into the question of whether the Division's assessment of priority and provision of services was consistent with its budget and with its treatment of similarly situated waiting-list eligibles. Assuming that equitable considerations alone can afford authority for ordering retroactive reimbursement by a State agency,[4] we think it clear that at most, such an order should be recognized as a rare equitable exception to the

---

[4] See discussion *infra* respecting effect of underfunding upon judicial power.

established rule which, even if issued, may be enforceable only within the Division's budgetary means.

Nothing in the present record suggests that S.I.'s placement and prioritization was so egregiously unfair or inconsistent with the policy of Circular #8 and the treatment of others on the priority list as to render unnecessary a placement hearing in the OAL under the *Mr. & Mrs. J.E.* mandate. Neither does the present record compare with the facts found to justify exercise of an extraordinary equitable power to order retroactive payment in *Rosen* and *T.R.*

S.I. was classified eligible and placed in Urgency Level III in 1988. As we observed above, the development of priority lists and placement standards by Circular was a response to the chronic fiscal problems of the Division. There are three thousand persons now eligible for service who, like S.I., have waited or are waiting on the lists established pursuant to Circular 8 and the earlier agreement between the Division and the Public Advocate.

As noted in *Rosen, supra,* 256 *N.J.Super.* at 641, 607 *A.*2d 1030, *N.J.S.A.* 30:4–25.6 provides that the commissioner "shall ... forthwith admit the eligible mentally retarded person, and provide him with [the most] appropriate functional service to the extent available," and if not immediately available " ... the commissioner shall provide alternate service and at the request of the applicant, shall also place the eligible mentally retarded person on a waiting list for the preferred service pending its availability." A similar right to services upon determination of eligibility is found in *N.J.S.A.* 30:6D–9.

There can be no question that a right to service comes into being upon a determination of eligibility. This is not congruent, however, with a right to reimbursement where service has reasonably been deferred for want of resources.

The Supreme Court has made it clear that even where the Legislature mandates a particular program, it is subject, insofar as it requires appropriations, to the legislative appropriation pro-

cess. *Karcher v. Kean,* 97 *N.J.* 483, 479 *A.*2d 403 (1984); *City of Camden v. Byrne,* 82 *N.J.* 133, 411 *A.*2d 462 (1980). Indeed, courts lack power to compel the executive branch to seek appropriations. *City of Camden,* at 149–150, 411 *A.*2d 462. *See also, Franklin v. Dept. of Human Services,* 225 *N.J.Super.* 504, 516, 543 *A.*2d 56 (App.Div.1988); *aff'd* 111 *N.J.* 1, 543 *A.*2d 1 (1988), and *N.J.S.A.* 2C:30–4 (cited in the Director's finding) which prohibits, and makes criminal, disbursement of public funds or incurring obligations in excess of the appropriation and limit of expenditure provided by law for a given department, division or public body. Unlike *Robinson v. Cahill,* 69 *N.J.* 133, 351 *A.*2d 713 (1975), *cert. den., Klein v. Robinson,* 423 *U.S.* 913, 96 *S.Ct.* 217, 46 *L.Ed.*2d 141 (1975), there is here no supervening constitutional provision or right which overrides the traditional limitations upon judicial compulsion of executive expenditure unfunded by the legislative branch. *See also, Fitzgerald v. Palmer,* 47 *N.J.* 106, 219 *A.*2d 512 (1966).

In sum, if it is true that the Division did not have funds for private placements of all persons in S.I.'s priority classification, nor in-house budgeted space appropriate for their well-being, the Division's method of handling S.I.'s placement may well have been reasonable.

■ Where the Legislature creates a class of beneficiaries which is greater than that which can be served by the amount of resources available for that purpose, and is silent on how to resolve the predicament, then the administrative agency may establish reasonable classifications and priorities to allocate these limited resources. *See, Morton v. Ruiz,* 415 *U.S.* 199, 230, 231, 94 *S.Ct.* 1055, 1072, 39 *L.Ed.*2d 270 (1974). As the Supreme Court of New Hampshire held in *Petition of Strandell,* 132 *N.H.* 110, 562 *A.*2d 173 (1989), a developmentally disabled person's statutory right to habilitative services is impliedly conditional upon sufficient legislative appropriations, and it is "within the director's authority to create a reasonable priority system to facilitate the distribution both of appropriated funds and of any additional funds that may

become available by supplemental appropriation or otherwise, although the system established might result in a particular client not immediately receiving services." *Id.* 562 *A.*2d at 179.

In light of *Mr. & Mrs. J.E.*, we cannot review the Division's placement actions respecting S.I. without remand to the OAL for consideration of the Director's actions upon a trial-type record, in which the Division bears the burden of establishing reasonableness of its placement decisions.

Upon remand, the record should explore whether S.I. was treated consistently with others similarly situated, and consistently with the standards set forth in applicable Division Circulars and directives. If she was, and if the record also supports the Director's factual position as to inadequacy of funding, there would be no occasion for a court to order retroactive repayment to Petitioners beyond the July 1, 1992, date when available funding caught up with S.I.'s prioritization and placement availability. To the extent that *T.R.* and *Rosen* may be read to differ with this approach, we respectfully disagree with such interpretation.

We do not preclude, of course, an effort by Petitioners to establish factually a pattern of egregiously arbitrary administrative behavior paralleling that which prompted the equitable relief in *Rosen.* We emphasize, however, that as the remand is to the OAL and ultimately the administrative agency, there can be no order for payment but only a recommendation and agency determination whether it can be accepted, should such egregious circumstances be deemed established as to S.I. Ordinarily, absent an explicit statutory grant of power, an agency may not act as a court of claims. *Sheeran v. Progressive Life Ins. Co.,* 182 *N.J.Super.* 237, 250, 440 *A.*2d 469 (App.Div.1981).

Finally, we recall our admonition in *T.L. v. DDD, Dept. of Human Serv.,* 243 *N.J.Super.* 476, 496, 497, 580 *A.*2d 272 (App. Div.1990), that rule making under the APA, *N.J.S.A.* 52:14B–1 to 15; and consistent with *Metromedia, Inc. v. Director, Div. of Tax,* 97 *N.J.* 313, 478 *A.*2d 742 (1984), is called for to insure the Division's application of uniform standards in making eligibility

determinations. No less is required to enable the public to be aware of, and to comment on, the Division's priority and placement standards which so profoundly affect the lives of thousands of eligible, but largely unserviced, developmentally disabled. This should be done promptly by the Division and the Department of Human Services.

We remand to the Office of Administrative Law for a trial-type hearing which shall address the open issues, as directed herein. We. do not retain jurisdiction.