622 A.2d 227

MR. AND MRS. J.E., ON BEHALF OF THEIR SON G.E., PETITIONERS–APPELLANTS, v. STATE OF NEW JERSEY, DEPARTMENT OF HUMAN SERVICES, DIVISION OF DEVELOPMENTAL DISABILITIES, RESPONDENT–RESPONDENT.

Argued November 9, 1992—Decided April 7, 1993.

*G. Emerson Dickman, III,* argued the cause for appellants (*Dickman & Mignogna,* attorneys; *Mr. Dickman* and *Margaret F. Mignogna,* on the briefs).

*Todd A. Wigder,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Lisa Marin Main,* Deputy Attorney General, on the brief).

*David B. Harris* and *Joseph B. Young,* Deputy Public Advocates, submitted a brief on behalf of *amicus curiae,* Public Advocate (*Zulima V. Farber,* Public Advocate, attorney; *Sarah Wiggins Mitchell,* Director, Division of Advocacy, of counsel).

The opinion of the Court was delivered by

STEIN, J.

This appeal concerns the due-process rights of developmentally-disabled persons who challenge placement decisions made by the New Jersey Department of Human Services' Division of Developmental Disabilities (Division or DDD). The parents of a profoundly-retarded young man opposed the DDD's decision to transfer their son to a new residence. They initiated the

administrative-appeals procedure set forth in *N.J.A.C.* 10:48–1.1 to –1.6, claiming that the new facility was not the most appropriate placement for their son. In accordance with the DDD's regulations, the parents' challenge proceeded through several levels of agency review. Ultimately, the Division denied the parents' request to return their son to his original placement. The Appellate Division affirmed the DDD's decision but remanded and directed the Division to disclose all information concerning its placement decision. We granted certification, 130 *N.J.* 12, 611 *A.*2d 651 (1992), to consider whether the interests and issues present in placement appeals require greater procedural protections than those afforded by the agency process.

## I

Mr. and Mrs. J.E. are the parents and legal guardians of G.E., a twenty-three-year old suffering from profound retardation, psychosis, autism, and hyperactivity. As a result of his condition, G.E. engages in maladaptive, attention-seeking, destructive behavior and requires twenty-four-hour supervision.

Because he needs constant monitoring, G.E. has been institutionalized for most of his life. In 1976, at the age of eight, G.E. began residing at the Woods School (Woods) in Langhorne, Pennsylvania. The Department of Human Services' Division of Youth and Family Services initially funded that placement. Once G.E. turned eighteen years old, the Fair Lawn Board of Education assumed the costs of G.E.'s continued residence at Woods.

On reaching majority, G.E. was no longer entitled to educational services through his local school board. However, G.E. was eligible as an adult for functional services from the DDD. After the Division had assumed responsibility for G.E.'s care, a DDD case manager evaluated G.E. and recommended that he remain at Woods as a purchase-of-care placement.

Despite the case manager's recommendation, the Division notified the parents of its plans to relocate G.E. to the New Lisbon Developmental Center (NLDC) in New Lisbon, New Jersey. The parents opposed the transfer. In June 1989, the parents filed a verified complaint and order to show cause in the Chancery Division seeking to enjoin the relocation and compel the DDD to fund G.E.'s placement at Woods. The Chancery Division ordered the DDD to fund G.E.'s stay at Woods until July 10, 1989, or until he was transferred to NLDC, whichever first occurred. On July 6, 1989, G.E. was moved to NLDC, where he continues to reside.

Following G.E.'s transfer to NLDC, the parents dismissed their pending action and initiated the administrative-appeals procedure set forth in *N.J.A.C.* 10:48–1.1 to –1.6. In accordance with the DDD's regulations, *N.J.A.C.* 10:48–1.3, the parents requested an informal conference seeking G.E.'s return to Woods, a placement that they viewed as the most appropriate for their son.

The informal conference was held in January 1990, at NLDC, before Philip Conti, Supervising Residential Service Specialist. At the conference, the parents were given the opportunity to voice their concerns regarding G.E.'s placement at NLDC. They were allowed to present the expert testimony of F. Charles Mace, Ph.D., who compared the physical facilities and habilitative programs at both Woods and NLDC. However, G.E.'s parents were denied legal representation and no transcript of the proceeding was made. *N.J.A.C.* 10:48–1.3(d)(1), (4). Following the conference, Conti denied the parents' request to transfer G.E. to Woods, finding that G.E.'s needs were being met adequately at NLDC.

The parents appealed Conti's decision to the Director of the DDD, Dr. Robert Nicholas. *N.J.A.C.* 10:48–1.4(a). Dr. Nicholas determined the matter to be "uncontested" and referred the case for administrative review. *N.J.A.C.* 10:48–1.1(h), – 1.4(b). In preparation for the administrative-review conference,

the parents requested access to documents in G.E.'s file concerning the Division's decision to place their son at NLDC. Those documents included the case manager's recommendation that G.E. remain at Woods as a purchase-of-care placement. The DDD denied the request, claiming that the documents were non-discoverable, intra-agency communications under *N.J.A.C.* 10:41–2.8(b)(2).

The administrative-review conference was held in May 1990, before Russell Carlini, a review officer appointed by the DDD. *N.J.A.C.* 10:48–1.6(a). At that stage of the appeals process, the parents were allowed legal representation and limited discovery. *N.J.A.C.* 10:48–1.6(c)(2), (6). Both parties were given the opportunity to introduce evidence, present testimony, and cross-examine witnesses. *N.J.A.C.* 10:48–1.6(c)(7). In addition, a transcript of the proceeding was made. *N.J.A.C.* 10:48–1.6(c)(4).

Philip Conti, who had presided at the informal conference conducted in January and had ruled against G.E.'s parents, presented the Division's position during the administrative-review conference. The Division argued that G.E.'s needs were being met adequately at NLDC, supporting its contentions with the testimony of G.E.'s Social Worker and Habilitation Planning Coordinator at NLDC. Both witnesses testified that G.E. had adjusted well to NLDC. However, neither witness was familiar with Woods, and neither could compare G.E.'s adjustment at NLDC with his progress at Woods. In addition, because they lacked subpoena power, G.E.'s parents were unable to question NLDC direct-care staff members who had worked with G.E. on a daily basis.

The parents' argument focused primarily on the quality of the placement to which their son was entitled. The parents claimed that G.E. was entitled to not merely an adequate placement but rather was guaranteed the most appropriate placement, the placement that would offer the maximum enhancement of his developmental potential in the least-restrictive

environment. *See N.J.S.A.* 30:4–24.2, 30:4–25.6, 30:6D–9, and *N.J.A.C.* 10:47–6.2. According to the parents, G.E. was being denied his statutory rights because Woods offered a more-appropriate and less-restrictive setting than NLDC.

Additionally, the parents objected to Dr. Nicholas' classification of the dispute as "uncontested." *N.J.A.C.* 10:48–1.2. The parents argued that challenges to placement decisions are "contested matters" and therefore should be transferred to the Office of Administrative Law (OAL) for a hearing conducted in accordance with the Administrative Procedures Act (APA), *N.J.S.A.* 52:14B–1 to –15. *N.J.A.C.* 10:48–1.5. Finally, the parents argued that the DDD should bear the initial burden of proving the appropriateness of a placement decision.

Following the parties' presentations, the parents requested that the record be held open because none of the Division's witnesses had knowledge of the standards used to determine the most appropriate placement for a DDD client. Agreeing that this information was critical to the parents' case, the review officer adjourned the hearing until that issue could be addressed.

The administrative review was completed by telephone conference in June 1990. Dr. Gwen Brown, Assistant Director of Residential Services for the DDD, explained the procedure followed in determining which of ten developmental centers is the most appropriate for a service recipient. Dr. Brown, however, was unable to answer the parents' questions concerning the standards used by the Division in deciding initially whether a client should be placed in a developmental center, such as NLDC, or a purchase-of-care facility, such as Woods. Once again, the parents requested that the record remain open until the DDD presented a witness who could address that issue. Their request was denied.

In July 1990, the administrative-review officer issued a "Recommended Decision" that G.E.'s placement at NLDC be continued. *N.J.A.C.* 10:48–1.6(c)(8). Dr. Carlini reasoned that the

parents had not established that the DDD had acted in an arbitrary and capricious manner by placing G.E. at NLDC.

Pursuant to *N.J.A.C.* 10:48–1.6(c)(9), the parents submitted their exceptions to Dr. Nicholas, the Division Director. The parents objected to the lack of representation at the informal conference, the lack of fairness in having the informal conference chairperson become the adversary at the administrative review, the denial of access to intra-agency communications, the lack of subpoena power, the use of agency personnel as hearing officers, and the failure to have the case heard by an administrative law judge as a contested matter.

In September 1990, the DDD issued its final decision denying the request to transfer G.E. to Woods. *N.J.A.C.* 10:48–1.6(c)(10). Dr. Nicholas stated that the parents had failed to meet their burden of proving that NLDC was not the least-restrictive setting in which G.E.'s developmental potential would be enhanced most effectively. In response to the parents' objections concerning the appeals process, Dr. Nicholas reaffirmed his characterization of placement disputes as "uncontested" and found the administrative procedure adequate.

The parents appealed the agency's final decision to the Appellate Division. *N.J.A.C.* 10:48–1.6(c)(11). They argued that the qualitative standards contained within *N.J.S.A.* 30:4–24.2, 30:4–25.6, 30:6D–9, and *N.J.A.C.* 10:47–6.2 confer on the Division's clients a legitimate property interest in the most appropriate available program that best can enhance their developmental potential in the least-restrictive environment. Further, the parents contended that the DDD's administrative-appeals procedure did not afford adequate due-process protection of that property right. Finally, the parents claimed that the Division should bear the initial burden of proving that the designated placement meets the statutory requirements. The Public Advocate submitted a brief as *amicus curiae.*

The Appellate Division affirmed the final agency decision. *Mr. and Mrs. J.E. v. New Jersey Dep't of Human Servs.*, 253

*N.J.Super.* 459, 602 *A.*2d 279 (1992). The court found that the DDD's classification of this dispute as "uncontested" was proper because no statutory or constitutional provision supports a right to an administrative hearing for the placement of a service recipient "in a particular center." *Id.* at 466, 602 *A.*2d 279 (emphasis omitted). In addition, the court concluded that the administrative-appeals procedure followed by the DDD in uncontested cases was adequate. *Id.* at 462, 602 *A.*2d 279. However, to assure the parents a fair opportunity to present their case, the court remanded the matter and directed the Division to disclose all information both supporting and contradicting its decision to place G.E. at NLDC. *Id.* at 468–69, 602 *A.*2d 279. The parents filed a motion for reconsideration, which the Appellate Division subsequently denied.

We granted certification to consider (1) whether the administrative-appeals process set forth in *N.J.A.C.* 10:48–1.1 to –1.6 provides adequate procedural protections in DDD placement disputes and (2) whether the DDD should be allocated the initial burden of proving the appropriateness of its placement decision.

## II

The parents contend that the APA, *N.J.S.A.* 52:14B–1 to –15, requires that challenges to DDD placement decisions be transferred to the OAL as contested matters because the services being sought by eligible developmentally-disabled citizens are property rights entitled to full due-process protection. DDD asserts that placement decisions are uncontested and that the administrative-appeals procedure conducted within the agency adequately addresses those challenges.

Prior to the establishment of the OAL, *L.* 1978, *c.* 67, *N.J.S.A.* 52:14F–1, most contested administrative cases were heard by hearing examiners employed by the agency responsible for rendering a decision in the matter. That practice was perceived as fostering a bias in favor of the agency and undermining the

fairness desired in administrative hearings. *In re Uniform Admin. Procedure Rules,* 90 *N.J.* 85, 89–90, 447 *A.*2d 151 (1982); *New Jersey Civil Serv. Ass'n v. State,* 88 *N.J.* 605, 608–09, 443 *A.*2d 1070 (1982); *Unemployed–Employed Council of N.J., Inc. v. Horn,* 85 *N.J.* 646, 650, 428 *A.*2d 1305 (1981).

To assure greater impartiality and objectivity in administrative adjudications, the Legislature amended the APA to create an independent OAL. *Horn, supra,* 85 *N.J.* at 650, 428 *A.*2d 1305 (citing Committee Statement to Senate No. 766, *L.* 1978, *c.* 67). By virtue of that amendment, the former agency examiners were replaced by Administrative Law Judges (ALJs), *N.J.S.A.* 52:14F–4, who now conduct hearings, make factual findings, and provide recommendations to the agency heads who ultimately decide contested cases. *In re Uniform Rules, supra,* 90 *N.J.* at 90, 447 *A.*2d 151.

Recognizing that some highly-specialized agencies require hearing examiners with special expertise, the Legislature specifically excluded certain agencies from the jurisdiction of the OAL. Committee Statement to Senate No. 766, *L.* 1978, *c.* 67. Under *N.J.S.A.* 52:14F–8, contested cases involving the State Board of Parole, the Public Employment Relations Commission, the Division of Workers' Compensation, the Division of Tax Appeals,[1] or "any agency not within section 2(a) of P.L.1968, c. 410 (c. 52:14B–2(a))", are not heard by ALJs unless specifically requested. When originally enacted, *N.J.S.A.* 52:14B–2(a) excluded from its definition of "agency" those entities responsible for the management and operation of State mental institutions and programs. *L.* 1968, *c.* 410, § 2. In 1981, that exclusion was excised. *L.* 1981, *c.* 27, § 10. Thus, the APA and its

---

[1] The Division of Tax Appeals has been replaced by the New Jersey Tax Court. *Horn, supra,* 85 *N.J.* at 651 n. 3, 428 *A.*2d 1305. The definition of "contested cases" under the APA was amended to reflect this change. *N.J.S.A.* 52:14B–2(b).

procedural safeguards are applicable to contested matters involving the DDD. *N.J.S.A.* 52:14B–2(a); 52:14F–8.

A "contested matter" is defined as

a proceeding, including any licensing proceeding, in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing, but shall not include any proceeding in the Division of Taxation, Department of the Treasury, which is reviewable de novo by the Tax Court.

[*N.J.S.A.* 52:14B–2(b).]

If determined to be a contested matter, an agency proceeding is referred to the OAL for a hearing in accordance with the APA, *N.J.S.A.* 52:14B–1 to –15, and the Uniform Administrative Procedure Rules, *N.J.A.C.* 1:1–1.1 to –21.6. *N.J.A.C.* 10:48–1.5. Such hearings afford the parties increased procedural protections, including the right to representation, *N.J.A.C.* 1:1–5.1; broad discovery, *N.J.A.C.* 1:1–10.1; and subpoena power, *N.J.A.C.* 1:1–11.1. In addition, if the matter is "contested," the parties are given an opportunity to present their case before an independent tribunal.

Thus, the statute guarantees a trial-type hearing for those proceedings in which the legal rights and duties of specific parties are required by statute or constitutional right to be determined by an agency. *High Horizons Dev. Co. v. Department of Transp.*, 120 *N.J.* 40, 47, 575 *A.*2d 1360 (1990) (citing *Public Interest Research Group of N.J., Inc. v. State*, 152 *N.J.Super.* 191, 205, 377 *A.*2d 915 (App.Div.), *certif. denied*, 75 *N.J.* 538, 384 *A.*2d 517 (1977)). G.E.'s parents concede that no statute gives the right to a hearing in placement challenges. We therefore must consider whether a trial-type hearing in placement appeals is required in order to vindicate the significant interests of DDD clients in asserting statutorily-established rights to appropriate placements.

The DDD acknowledges that G.E. has a constitutionally-protected property interest in the receipt of services. However, the Division contends that that interest does not extend to a specific placement of G.E.'s choice. The Appellate Division agreed that a hearing regarding the placement of a DDD client "in a particular center" is not required either by statute or as a matter of constitutional right. 253 *N.J.Super.* at 466, 602 *A.*2d 279 (emphasis omitted).

The parents contend that the Division's characterization of their son's property interest is too restrictive. They assert that G.E. is entitled to not merely a placement but rather to the most appropriate placement available that best can enhance his developmental potential in the least-restrictive environment. According to the parents, the administrative-appeals procedure set forth in *N.J.A.C.* 10:48–1.1 to –1.6 does not afford adequate due-process protection of that property interest.

### III

Before deciding whether the administrative procedure followed by the DDD in placement appeals satisfies the requirements of due process, we first must determine whether the services being sought by G.E. and his parents are the types of interests that demand due-process protection.

The United States Constitution guarantees that no State shall deprive any person of "property" without due process of law. *U.S. Const.* amend. XIV, § 1. Similarly, the New Jersey Constitution considers the acquisition, possession, and protection of "property" a "natural and unalienable right" subject to due-process protections. *N.J. Const.* art. I, par. 1.

We have recognized that the chief ingredient in a property interest protected by the due-process clause is a legitimate claim of entitlement. *Nicoletta v. North Jersey Dist. Water Supply Comm'n,* 77 *N.J.* 145, 154–55, 390 *A.*2d 90 (1978) (citing *Board of Regents v. Roth,* 408 *U.S.* 564, 577, 92 *S.Ct.* 2701, 2709, 33 *L.Ed.*2d 548, 561 (1972)). An entitlement is created

and its dimensions are defined by state law. *New Brunswick Sav. Bank v. Markouski*, 123 *N.J.* 402, 411, 587 *A.*2d 1265 (1991). Therefore, we examine the statutes, regulations, and case law concerning the provision of services to the Division's clients to determine the scope of G.E.'s interest.

We previously have acknowledged the Legislature's commitment to the care and treatment of the handicapped. *New Jersey Ass'n for Retarded Citizens v. New Jersey Dep't of Human Servs.*, 89 *N.J.* 234, 249, 445 *A.*2d 704 (1982). The Legislature has enacted the "Developmentally Disabled Rights Act," *N.J.S.A.* 30:6D–1 to –22, which guarantees mentally-retarded residents at any facility the same fundamental rights that all other citizens possess, and has steadfastly sought to improve the services offered to the handicapped of this state. *Ibid.*

To that end, the Legislature has expressly determined that persons found eligible for functional services are entitled to the services deemed "most appropriate" for their training, habilitation, care, and protection. *N.J.S.A.* 30:4–25.4, 30:4–25.6. It has mandated that every patient receiving treatment through the DDD has a right "[t]o the least restrictive conditions necessary to achieve the purposes of treatment." *N.J.S.A.* 30:4–24.2e(2). Each service recipient has a legal right to an Individual Habilitation Plan (IHP) tailored to "attain or maintain the optimal * * * functioning of which the individual is presently or potentially capable." *N.J.A.C.* 10:47–6.2(a)(1). Significantly, the Legislature has also required that the services provided be "designed to maximize the developmental potential" of the DDD client "in a setting and manner which is least restrictive of [his or her] personal liberty." *N.J.S.A.* 30:6D–9.

Because of those statutory and regulatory requirements, we previously have held that every DDD client is entitled to "treatment, education, training, habilitation, care and protection * * * in the setting that is least restrictive of each person's personal liberty but still compatible with his or her individual

needs." *New Jersey Ass'n for Retarded Citizens, supra,* 89 *N.J.* at 252, 445 *A.*2d 704. Thus, our statutory and decisional law have recognized that eligible developmentally-disabled citizens possess a legitimate property interest in the receipt of services. The scope of that interest is defined by the qualitative standards contained within the statutes that govern the provision of services to the developmentally disabled. *N.J.S.A.* 30:4–24.2, 30:4–25.6, 30:6D–9, and *N.J.A.C.* 10:47–6.2. We hold that the DDD's clients have a constitutionally-protected right, based on statutory and regulatory entitlements, to the most appropriate placement available that best can enhance their developmental potential in the least-restrictive setting.

We now consider whether the administrative-appeals procedure set forth in *N.J.A.C.* 10:48–1.1 to –1.6 affords adequate due-process protection in disputes seeking to vindicate the right of a handicapped person to the most appropriate placement. We recently addressed the question of what type of hearing is required to assure fairness in administrative appeals. See *High Horizons, supra,* 120 *N.J.* 40, 575 *A.*2d 1360. In *High Horizons,* we noted that the need for a trial-type hearing is influenced by whether the agency is acting in a quasi-judicial or legislative capacity. *Id.* at 50, 575 *A.*2d 1360. If the agency is exercising its administrative expertise to render a policy determination not involving the adjudication of disputed facts, a trial-type hearing ordinarily is not required. *Id.* at 51, 575 *A.*2d 1360. However, "if the question turns on expert opinion relied on by the agency, one must be able in some way to contest the bases of the opinion." *Ibid.* If the issues involved require the agency " 'to consider the evidence and apply the law to the facts as found,' " then a hearing is necessary. *Id.* at 50, 575 *A.*2d 1360 (quoting *Cunningham v. Department of Civil Serv.,* 69 *N.J.* 13, 21, 350 *A.*2d 58 (1975)).

In *High Horizons,* we found that a trial-type hearing was not required where a property owner sought a State-highway-access permit. 120 *N.J.* at 54, 575 *A.*2d 1360. The only

evidence introduced were diagrams and plans of alternative access routes submitted by property owners. *Id.* at 50–51, 575 *A.*2d 1360. The issue presented was which of those alternatives best comported with the Department of Transportation's (DOT) overall policies concerning traffic patterns in that area. *Id.* at 48, 575 *A.*2d 1360. That issue required the DOT to act in a capacity more legislative than adjudicative, and we concluded that a trial-type hearing was not necessary. *Id.* at 52, 575 *A.*2d 1360.

Similarly, we must consider the issues present in placement appeals to determine the type of process required for their protection. In a hearing to consider the validity of a placement decision, expert witnesses would be expected to testify concerning the types of services best suited to the client's unique needs and to compare the individual's level of functioning at the new facility to his or her progress at the former residence. Also, witnesses would be likely to address the factors that determine which placement would best achieve the person's habilitative goals, and the level of restriction on the client's liberty that is dictated by the degree of handicap.

In determining the procedures required to address and protect those issues and interests, we apply the analysis set forth by the United States Supreme Court in *Mathews v. Eldridge,* 424 *U.S.* 319, 96 *S.Ct.* 893, 47 *L.Ed.*2d 18 (1976). *See Rivera v. Board of Review,* 127 *N.J.* 578, 589, 606 *A.*2d 1087 (1992) (applying *Mathews* framework); *Markouski, supra,* 123 *N.J.* at 415–16, 587 *A.*2d 1265; *High Horizons, supra,* 120 *N.J.* at 51, 575 *A.*2d 1360; *Board of Educ. v. Cooperman,* 105 *N.J.* 587, 599, 523 *A.*2d 655 (1987); *In re Promulgation of Guardianship Servs. Regulations,* 103 *N.J.* 619, 634, 512 *A.*2d 453 (1986); *In re Polk License Revocation,* 90 *N.J.* 550, 562, 449 *A.*2d 7 (1982). The *Mathews* three-pronged test requires that we consider (1) the private interest at stake; (2) the risk of erroneous deprivation of that interest through the agency procedures used, and the probable value of additional or substitute procedural safeguards; and (3) the State's interest, including the

fiscal and administrative burdens that the additional procedural safeguards would entail. *Mathews, supra,* 424.*U.S.* at 335, 96 *S.Ct.* at 903, 47 *L.Ed.*2d at 33.

In placement appeals, the interests at stake are clear, and their magnitude self-evident. The choice of placement affects each aspect of a handicapped person's life. The quality of care received, the kinds of activities offered, and the types of habilitative goals pursued are all intimately affected by the placement decision. The significance of the private interest is further magnified by the length and finality of that decision. Once a facility is chosen, a developmentally-disabled adult could remain for thirty, forty, or fifty years. The only opportunity to contest that choice is through the administrative-appeals procedure.

In this case, we have the benefit of a record regarding the agency's appeal procedure and are able to discern those aspects that are demonstrably inadequate. Under the current administrative procedure, the lack of subpoena power significantly restricted the parents' ability to present their case and address issues that were critical to their appeal. No staff members having direct contact with G.E. on a daily basis were present to testify regarding his adjustment to NLDC. No witness had knowledge of Woods; therefore, a comparison of G.E.'s progress at each facility was impossible. No official could explain the standards used by the DDD in initially deciding to place a client in a developmental center as opposed to a purchase-of-care facility. Thus, the nature of the information presented was limited by the Division's choice of witnesses.

In addition, the DDD was resistant to sharing its internal deliberations with the parents. As a result, the parents were denied access to documents regarding the DDD's decision to place G.E. at NLDC. The Appellate Division, while not affording a trial-type hearing, did recognize the need for increased discovery to assure the parents a fair opportunity to present their case. 253 *N.J.Super.* at 468–69, 602 *A.*2d 279.

The use of an agency official to preside at the informal conference and later to advocate the Division's position at the administrative-review conference created the appearance of partiality. The DDD has an understandable interest in upholding its own decisions. Faced with limited resources, the DDD cannot be guided exclusively by the best interests of its clients, because the agency's own fiscal needs may affect its exercise of discretion. We acknowledge that an agency employee hearing a matter on appeal is not automatically biased in favor of the agency. *In re Carberry*, 114 *N.J.* 574, 585, 556 *A.*2d 314 (1989). However, we cannot ignore the overriding concern for the appearance of procedural fairness in agency adjudications. *See Marshall v. Jerrico, Inc.*, 446 *U.S.* 238, 242–44, 100 *S.Ct.* 1610, 1613–14, 64 *L.Ed.*2d 182, 188–89 (1980). The very purpose for which the OAL was established was to foster a perception of objectivity and impartiality in those proceedings. *Horn, supra*, 85 *N.J.* at 650, 428 *A.*2d 1305 (citing Committee Statement to Senate No. 766, *L.* 1978, *c.* 67).

We sense that the administrative-appeals procedure used by the DDD does not adequately address or protect the concerns underlying placement appeals involving issues and interests analogous to those presented in this proceeding. Requiring the agency to augment its procedures in order to provide additional process would undoubtedly address some of the existing deficiencies. Because of the extent of the required procedural protections, however, we conclude that placement challenges comparable to the proceeding before us should be regarded as essentially equivalent to "contested matters" under the APA. We are satisfied that the nature of the protections needed are best served by a trial-type hearing before an ALJ, and that the additional protections afforded by such a hearing are justified because of the significant property interests at stake. Moreover, counsel's statements during oral argument concerning the Division's past experience with contested placement proceedings suggest that the additional procedural safeguards that we impose should not prove to be unduly burdensome.

In so holding, we recognize the advantages of maintaining the informal conference. In a relaxed, non-adversarial setting, communication between the Division and its clients is enhanced, affording the parties an opportunity to explore the possible reconciliation of their differences. We endorse the continued use of the informal conference as a means of facilitating and encouraging the early resolution of disputes. See Joel Handler, *Law and the Search for Community* 18–19, 23, 83–106 (1990); *Lascari v. Board of Educ.*, 116 *N.J.* 30, 54, 560 *A.*2d 1180 (1989) (citing Joel Handler, *The Conditions of Discretion: Autonomy, Community, Bureaucracy* 92–119 (1986)). However, the agency employee who presides over that initial conference should not become the parents' adversary at the next level of review. The trust developed between the parents and the agency during the informal conference is. breached and the appearance of an unfair advantage is created. Thus, the agency may continue the informal conference procedure, but the presiding official may not represent the Division at subsequent proceedings.

## IV

Finally, we have been asked to consider the allocation of the burden of proof in placement appeals. The parents contend that they impermissibly were required to prove that the DDD's decision to place G.E. at NLDC was inappropriate. They argue that the initial burden of proving the appropriateness of a placement should be borne instead by the Division. The DDD claims that the burden of proving that NLDC was an appropriate placement for G.E. properly was placed on the agency and that the DDD met its burden.

█ We generally have imposed the burdens of persuasion and production on the party best able to satisfy those burdens. *Lascari, supra,* 116 *N.J.* at 45, 560 *A.*2d 1180; *Andersen v. Exxon Co.*, 89 *N.J.* 483, 500, 446 *A.*2d 486 (1982). Our decisions have recognized that the party with greater expertise and

access to relevant information should bear those evidentiary burdens. *Lascari, supra,* 116 *N.J.* at 45, 560 *A.*2d 1180; *Andersen, supra,* 89 *N.J.* at 500, 446 *A.*2d 486. That result is particularly sound in less-adversarial settings in which both parties maintain a common objective. *Lascari, supra,* 116 *N.J.* at 46, 560 *A.*2d 1180. In those circumstances, the goal of the parties is not so much to win as to reach the correct result.

In *Lascari, supra,* we held that in due-process hearings concerning the adequacy of an individualized education program (IEP) for a handicapped student, the school district responsible for the IEP had the burden of proving its appropriateness. *Id.* at 44, 560 *A.*2d 1180. The school district's ready access to records concerning the child as well as its expertise in the field of IEP development justified the allocation of the burden. *Id.* at 45, 560 *A.*2d 1180. Further, we noted that both the parents and the school district had an interest in assuring an appropriate education for the handicapped child. *Id.* at 46, 560 *A.*2d 1180.

Similarly, in placement appeals, the common goal of both parties is to identify the most appropriate placement for the developmentally-disabled individual. In that endeavor to find the best solution, all relevant information must be presented. The DDD maintains extensive records regarding its clients and has expertise in the development of Individual Habilitation Plans adopted to implement its clients' specific needs. The DDD has greater access to information concerning appropriate services, and the parents may be unaware of available alternatives. *See Rosen v. New Jersey Div. of Developmental Disabilities,* 256 *N.J.Super.* 629, 607 *A.*2d 1030 (App.Div.1992). Thus, we conclude that in proceedings instituted to challenge the DDD's placement decisions, the Division bears the burden of proving that its choice is the most appropriate for the developmentally-disabled client.

## V

Eligible developmentally-disabled citizens are guaranteed by statute the most appropriate placement available that best can enhance their developmental potential in the least-restrictive environment. To provide adequate due-process protection of that right, placement disputes involving interests such as those presented by this appeal should be referred to the OAL for a trial-type hearing under the APA. In addition, the DDD should bear the burden of proving that its placement decision satisfies the service recipient's legal entitlement. Those additional procedural requirements will assure that the interests and issues present in placement appeals are fairly and adequately addressed.

The judgment of the Appellate Division is reversed and the matter remanded to the OAL for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.