265 N.J. Super. 266 (1993)
626 A.2d 473
L.P. (BY HER PARENTS, AS GUARDIANS-AD-LITEM), PLAINTIFF-RESPONDENT,
v.
EDISON BOARD OF EDUCATION, DEFENDANT-RESPONDENT/CROSS-APPELLANT, AND STATE OF NEW JERSEY, DEPARTMENT OF HUMAN SERVICES, AND THE COMMISSION FOR THE BLIND AND VISUALLY IMPAIRED, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Law Division Middlesex County.
Decided April 22, 1993.
*268 Linda J. Robinson, for the plaintiff, (Herbert D. Hinkle, attorney), Ms. Robinson On the Brief.
James E. Stahl, Jr., for the Defendant-Respondent/Cross-Appellant, Edison Board of Education, (Borrus, Golden, Foley, Vignuolo, Hyman & Stahl, attorneys), Mr. Stahl and Aphrodite C. Koscelansky, On the Brief.
Robert J. Del Tufo, Attorney General of New Jersey, for the Department of Human Services and the Commission for the Blind and Visually Impaired, Benjamin Clarke, Senior Deputy Attorney General, Of Counsel; James T. Hill, Jr., Deputy Attorney General, On the Brief.
WOLFSON, J.S.C.

I. Introduction

This special education case presents certain perplexing questions of first impression regarding the jurisdictional and appeal provisions of the Individuals With Disabilities Education Act (IDEA), 20 U.S.C.A. Sec. 1400 et seq. At issue are the individual educational needs of L.P. (Laura), a blind, profoundly retarded, multi-handicapped 17 year old girl.
Pursuant to federal (IDEA) and State (N.J.S.A. 18A:46-1) laws, every handicapped child is entitled to a "free and appropriate public education" (FAPE). In conformance with that goal, the New Jersey Department of Education (DOE) has promulgated regulations designed to insure that the individualized educational needs of each special child are met; see, N.J.A.C. 6:28-3.6(c) *269 (requiring school districts to develop annually an individualized education plan (IEP) to address the educational needs of each handicapped child); and which require the local Board of Education to be financially responsible for the special education costs, including, if educationally necessary, room and board expenses. N.J.A.C. 6:28-7.4(b)(4).[1] Where a child's parents object to the IEP developed by the local school board, the plan's "appropriateness" may be adjudicated by filing a "due process" petition with the DOE, the procedure pursued by Laura and her parents in this case. See, N.J.A.C. 6:28-2.7.

A. Factual Background
Since 1984, Laura has attended the St. Joseph's School for the Blind (St. Joseph's) in Jersey City. St. Joseph's provided Laura with a ten month educational program for approximately three years. While a summer education program is not available, St. Joseph's does offer a one month non-residential camp and recreational program, which Laura has attended. Until 1989 Laura attended day classes only. That year she was enrolled in an overnight program enabling her to reside Monday through Thursday nights at the school. By the end of 1991, Laura's parents were concerned that their daughter was not progressing adequately, believing that a twelve month, full time residential educational program would best suit Laura's educational needs.
*270 In early 1992, after having reviewed several possibilities, Laura's parents, in consultation with Laura's child study team, determined that the Perkins School for the Blind, in Watertown, Massachusetts, was an appropriate program for their daughter, and requested that the Edison Board of Education ("Edison" or the "Board") place her there at no cost. While the Board agreed that Perkins was an appropriate placement, it invited the Commission for the Blind and Visually Impaired (CBVI), a sub-agency within the State Department of Human Services (DHS) to assume the costs of room and board. Although the CBVI had been contributing $15,000.00 annually to defray Laura's room and board costs at St. Joseph's, the CBVI declined to honor the Board's request, purportedly because the Commission, as a matter of policy, does not make its residential placement decisions based upon "educational necessity".[2] Subsequent to the Commission's rejection of the Board's (and Laura's) request to fund the full time residential placement costs of Perkins, Laura's parents filed a due process petition under N.J.A.C. 6:28-2.7, seeking to require Edison to assume full financial responsibility. In response to the petition, the Board sought to compel the participation of the DHS, the Division of Developmental Disabilities (DDD), the Division of Youth and Family Services (DYFS) and the Commission for the Blind and Visually Impaired (CBVI) as party defendants, an application joined in by Laura's parents.
Ultimately, on September 28, 1992, an Administrative Law Judge (ALJ) determined that CBVI, a sub-agency of the DHS was a proper and an indispensable party to the matter in controversy, but declined to compel the joinder of the DDD, DYFS or DHS. Following a plenary hearing, the ALJ directed Laura's placement at the Perkins School, ordering the DHS (not the CBVI) to pay *271 the "room and board costs through whatever program or programs it deems appropriate."[3]
Aggrieved by both the procedural and substantive determinations of the ALJ, the DHS and CBVI filed a Notice of Appeal with the Law Division of the Superior Court, an option authorized by the IDEA,[4] triggering the right to an independent, de novo review and decision by this court.[5]

B. Statutory And Regulatory Background
The IDEA reflects a strong federal policy to provide an appropriate education for every handicapped child; Kruelle v. New Castle County Sch. Dist., 642 F.2d 687, 690 (3d Cir.1981). Its *272 enactment underscored the perceived need for an expanded federal fiscal role in assuring protection for the rights of handicapped children throughout the United States. Id. at 691. See also, Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808 (3d Cir.1990). Among its purposes is to assure that all handicapped children have available to them a free and appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of handicapped children and their parents or guardians are protected, to assist states and localities to provide for the education of all handicapped children, and to assess and assure the effectiveness of efforts to educate handicapped children. 20 U.S.C.A. Sec. 1400(c). As defined by the IDEA, handicapped children are those children with specified impairments who, because of those impairments, require special education and related services. 20 U.S.C.A. Sec. 1401(a)(1).[6]
States receiving federal funds under IDEA must comply with an extensive set of goals and procedures to insure that all such handicapped children have access to a free and appropriate public education.[7]See 20 U.S.C.A. Secs. 1412, 1413 (requiring any state seeking federal aid to submit a plan assuring an FAPE to all *273 handicapped children, including a description of the facilities, personnel, services and time table for making such education available, a commitment to developing an IEP for each handicapped child and the establishment of procedural safeguards to protect the rights of handicapped children, parents, and guardians); and see Irving Independent School Dist. v. Tatro, 468 U.S. 883, 889, 104 S.Ct. 3371, 3375, 82 L.Ed.2d 664 (1984).
Consistent with its obligation under IDEA, New Jersey has enacted statutes and regulations which require all local Boards of Education in the State to identify children between the ages of five and twenty-one who may need or benefit from special education. N.J.S.A. 18A:46-6. Once identified, those children must be provided with appropriate facilities and programs of education at no cost by the local school board. N.J.S.A. 18A:46-8, 9, 10, 13 and 14; see also, N.J.A.C. 6:28-1.1(d) (each district board of education is responsible for providing a system of free, appropriate special education and/or related services to its pupils); and see, Lascari v. Board of Educ., supra, 116 N.J. at 34-35, 560 A.2d 1180 (1989).
Procedural regulations, designed to safeguard the educational rights of all handicapped children have also been enacted and the DOE has been established[8] as the forum agency for handling "due *274 process" petitions to review local agency decisions and actions regarding the provision of an FAPE for handicapped children. See, N.J.A.C. 6:28-2.7. Pursuant to those regulations, the Office of Administrative Law (OAL) has been designated to hear special education complaints, N.J.A.C. 6:28-2.7(e)(4)(iv), and the decision of the ALJ on the educational needs of the child and the appropriateness of the IEP is final and binding on the parties and must be implemented without undue delay. See, N.J.A.C. 6:28-2.7(g); see also, C.S. v. Middletown Township Board of Education, 259 N.J. Super. 340, 342, 613 A.2d 492 (App.Div. 1992) (IDEA has the effect of vesting the Office of Administrative Law with original jurisdiction to hear disputes respecting the education of mentally disabled children).

II. Scope Of OAL/ALJ Jurisdiction

Much of the initial controversy surrounding the resolution of this case arises from the ALJ having asserted jurisdiction over the DHS through its sub-agency, the CBVI. The State argues that since the CBVI neither receives funds under the IDEA nor is charged with assuring that disabled children receive a "free, appropriate public education" under the Act, it cannot be subject to the special education case jurisdiction of the OAL. In support of its position, the State relies on one reported and several unreported ALJ opinions and upon the more general enabling regulations governing the jurisdiction of the OAL.[9]
Except for the specific jurisdictional provisions of the IDEA and the New Jersey regulatory scheme enabling the OAL to hear "due process" petitions and adjudicate the propriety of a handicapped *275 child's educational placement, the jurisdiction of the OAL is governed by N.J.A.C. 1:1-3.2(a):
"The Office of Administrative Law shall acquire jurisdiction over a matter only after it has been determined to be contested by an agency head and has been filed with the Office of Administrative Law or as otherwise authorized by law, except as provided by N.J.A.C. 1:1-17. The Office of Administrative Law shall not receive, hear or consider any pleadings, motions, papers or documents of any kind to any matter until it has acquired jurisdiction over the matter, except as provided by N.J.A.C. 1:1-17."[10]
A "contested case" refers to:
"An adversary proceeding ... in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing."
N.J.A.C. 1:1-2.1.
When one considers the Legislature's purposes in creating the Office of Administrative Law (OAL) it is difficult to dispute the State's position. Although Administrative Law Judges conduct evidentiary hearings and make findings of fact and render conclusions based thereon, their decisions are, with but few exceptions, non-binding recommendations which may be accepted, modified, or rejected in whole or in part by an agency head, appointed by the Chief Executive.[11]In re Uniform Adm'v Procedure Rules, 90 N.J. 85, 90-94, 447 A.2d 151 (1982) (hereafter "In Re Uniform Rules"); Mr. and Mrs. J.E., on behalf of their son, G.E. v. State of New Jersey, Etc., 131 N.J. 552, 560, 622 A.2d 227 (1993) (hereafter "G.E."). Their primary purpose is the creation of a record via an *276 evidentiary hearing both to enable the agency head to make an intelligent and informed decision and to facilitate appellate review of that decision in order to insure that it was supported by substantial credible evidence.[12] Administrative Law Judges have no independent decisional authority. In re Uniform Rules, supra, 90 N.J. at 94, 447 A.2d 151. Accordingly, any attempt to exercise such authority, as noted by the Supreme Court, "would constitute a serious encroachment upon an agency's ability to exercise its statutory jurisdiction and discharge its regulatory responsibilities." Id.
Absent a legislative intent to implement the purposes and goals of the IDEA in a manner other than that discussed above, the ALJ decision in this case and, thus the contrary contentions of the Edison Board of Education and Laura's parents, cannot be sustained.
The Edison Board of Education and Laura's parents urge that the ALJ's "due process" jurisdiction should extend to all political subdivisions of the State involved in the education of handicapped children, including other State agencies. They contend that since the CBVI is required to "provide instruction and assist in suitable educational placement for blind, visually impaired and multi-handicapped children", N.J.A.C. 10:91-1.7(b)(6), and because subparagraph (g) of that section states that the IDEA applies "to all agencies having direct or delegated authority for the education of handicapped children", such other agencies must, of necessity, be subject to the special education case jurisdiction of the OAL.
In support of their position, Laura's parents rely on Kerr Center Parents Assoc. v. Charles, 842 F.2d 1052 (9th Cir.1988). That case is inapposite to and fails to resolve, the jurisdictional issue. While it is no doubt true that special education law and regulations *277 recognize that component parts of a free, appropriate public education may, consistent with federal law, be provided by collateral agencies, in New Jersey, unlike the regulatory scheme in effect in Kerr (Oregon), the obligation to provide a free and appropriate public education has been imposed exclusively on local boards of education through the DOE, which has been designated to handle petitions for "due process" review of local school board decisions regarding the provision of an FAPE.
Moreover, because blind and visually impaired children are considered educationally handicapped under N.J.S.A. 18A:46-8, their educational program is governed by an IEP developed by the local school district through its child study team. N.J.A.C. 6:28-3.1 to 3.6(c). The CBVI does not develop IEPs, but rather insures only that any services it is required to, or does provide, will conform to the district-developed IEP. N.J.A.C. 10:91-1.7(h).
That is not to say that the CBVI may not have its own substantive obligations to provide assistance to eligible blind and visually impaired children such as Laura.[13] Indeed, all of CBVI's functions are geared toward ameliorating the condition of blindness and improving the conditions and quality of life for blind individuals so they can function more independently in society. N.J.A.C. 10:91-1.2. However, any entitlement to financial or other assistance from CBVI must be obtained outside the limited context of a "due process" review hearing.[14]Cf. A.N. v. Clark Bd. of Ed., 6 N.J.A.R. 360, 363 (1983).
*278 This conclusion is in accord with the decisions rendered by a Federal District Court in Ass'n for Retarded Citizens in Colo. v. Frazier, 517 F. Supp. 105 (D.Colo. 1981) and by a California Intermediate Appellate Court in Nev. Cty. Office of Educ. v. Super. of Pub Inst. 197 Cal. Rptr. 152, 149 Cal. App.3d 767 (Cal. App. 3 Dist. 1983). In the Frazier case, supra, the Commissioner of the Colorado Department of Education moved to dismiss a due process complaint based upon plaintiffs' failure to name indispensable parties to the action, namely, inter alia, the Colorado Department of Institutions. Although the District Judge acknowledged that other public agencies might have an interest in the outcome of the pending litigation, plaintiffs' request for joinder was rejected. Id. at 123. As thereafter explained:
"The joinder of ... the Department of Institutions, along with any other tangentially related public agencies, could transform a trial on the issues to a finger pointing contest among defendants regarding with whom the responsibility of educating handicapped children lies."
Id. at 124. Likewise, in the Nev. Cty. case, supra, the California Appellate Court declined to compel the joinder of the California Children's Services (CCS), a Division of the State Department of Health Services in a due process hearing. The administrative hearing officer had concluded that joinder was "not necessary to resolve the issues in this case," since plaintiff's concerns could be "more appropriately handled through other administrative procedures." 197 Cal. Rptr. at 157, 149 Cal. App.3d at 774. On appeal, plaintiff urged that CCS should be a party to the action in order to ascertain the extent of its obligation to provide therapy services. Rejecting this request the Appellate Court stated:

*279 "While [plaintiff] may in fact be correct about [CCS's] obligation, it is wrong in concluding that federal and state law require all government agencies that may be involved in funding therapy be present at the due process hearing; indeed, such a requirement would effectively defeat the goal of providing `an expeditious and effective process' by involving issues unrelated to a child's educational need for medical services.
* * * * * * * *
Larger systemic issues, such as which government agency should provide or pay for ... services needed, involve only tangentially the parent and pupil, and would clearly expand the scope of the administrative hearing beyond that contemplated...
[The] Code of Civil Procedure ... which requires joinder of necessary and indispensable parties in judicial proceedings, is not apt to the extent its application would defeat the purpose of the administrative proceeding" (footnote omitted; emphasis added).
197 Cal. Rptr. at 158, 159, 149 Cal. App.3d at 775, 776, 777.
This court is not insensitive to the special needs and strong legislative policy designed to protect and enhance the quality of life for our developmentally disabled citizens. Those ideals and policies were clearly recognized by the Supreme Court in N.J. Assn. for Retarded Citizens v. Human Services, 89 N.J. 234, 252, 445 A.2d 704 (1982), where Justice Pashman, writing for a unanimous court, eloquently stated:
"The Legislature has declared it the policy of this State to maximize the developmental potential of these citizens while affording them the maximum feasible personal liberty. Like all other citizens, the mentally retarded have the right to pursue happiness. Unlike other citizens, they have unique hurdles to overcome in doing so. Rather than exclude them from the pursuit of happiness, the Legislature has made an effort to include them in our civic community by providing them with the special services they need to develop and grow. This public policy affirms our common humanity. Their concerns are our concerns. In this State, we do not set people adrift because they are the victims of misfortune. We take care of each other."
The determination here that an ALJ's jurisdictional reach in conducting a due process hearing does not extend to State agencies such as DHS, is not tantamount to setting Laura adrift. Indeed, to the extent that the residential placement at the Perkins School is deemed to be both educationally necessary and the least restrictive alternative, such a placement will be ordered at no cost to Laura's parents. See e.g., Kruelle, supra, 642 F.2d at 693-94, *280 695; North v. Dist. of Columbia Board of Education, 471 F. Supp. 136 (D.D.C. 1979); Tatro v. State of Texas, 625 F.2d 557 (5th Cir.1980); Nev. Cty., supra, 197 Cal. Rptr. at 157-58, 149 Cal. App.3d at 775; c.f. Battle v. Commonwealth of Pennsylvania, 629 F.2d 269 (3d Cir.1980) (180 school-day rule cannot be presumed to satisfy needs of handicapped children).
Since neither the DHS nor the CBVI, as contrasted against the local school board, can be subjected to the special education jurisdiction of an ALJ, that portion of the decision below, purporting to order the DHS to pay Laura's room and board costs at Perkins, must be vacated and reversed.

III. Proceedings Before the Law Division

A party aggrieved by an ALJ's determination in a due process hearing is entitled to appeal the decision in either state or federal court. 20 U.S.C.A. Sec. 1415(e)(2); Lascari v. Board of Educ. 116 N.J. 30, 37, 560 A.2d 1180 (1989); C.S. v. Middletown Township Board of Educ., 259 N.J.Super 340, 342-43, 613 A.2d 492 (App.Div. 1992).[15] In this case the Board and Laura's parents alternatively urge that notwithstanding the ALJ's lack of jurisdiction, the Law Division is empowered to grant relief against State agencies other than the Department of Education.
While the resolution of an ALJ's jurisdictional reach in a due process hearing is not necessarily dispositive of the Law Division's jurisdictional authority (supra at n. 9), the Congressional intent underlying the IDEA and pragmatic procedural concerns suggest that the expansive approach urged by Laura and by the Board is *281 inappropriate. Rather, the authority and obligation of the Law Division, as a court of general jurisdiction, to grant full and complete relief against indispensable parties[16] is not congruent with and must give way, to both the clearly specified Congressional intent[17] and New Jersey's own Court Rules regarding appeals of final agency action.[18]

A. Congressional Intent
The rationale for limiting the ALJ's jurisdictional reach based upon the intent of Congress (supra, Section II) applies with equal force to the Law Division. The legislative history clearly indicates that Congress considered the establishment of a single agency on which to focus responsibility for assuring a free appropriate public education for handicapped children to be of "paramount importance." Kruelle, supra, 642 F.2d at 696. A portion of the Senate's committee report bears repeating here:
Presently, in many States, responsibility is divided, depending upon the age of the handicapped child, sources of funding, and type of services delivered. While the committee understands that different agencies may, in fact, deliver services, the responsibility must remain in a central agency overseeing the education of *282 handicapped children, so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency.
See, S.Rep. No. 168, 94th Cong., 1st Sess. 24 reprinted in [1975] U.S.Code Cong. & Ad.News 1425, 1448.
These same policy considerations persuaded the District Court in Ass'n for Retarded Citizens in Colo., supra, to reject a request to compel the joinder of additional entities in the due process hearing there under review, 517 F. Supp. at 123-24; and similarly prompted a California Appellate Court in Nev. Cty. Off. of Educ., supra, to reject an application to join a division of the State Department of Health as a party defendant as well. 197 Cal. Rptr. at 157-159, 149 Cal. App.3d at 775-78. Jurisdiction will, likewise, not be exercised over the DHS/CBVI in the pending matter.

B. Pragmatic Concerns: Rule 2:2-3
Although the ALJ was clearly motivated by pragmatic concerns in asserting jurisdiction over the DHS/CBVI, other practicalities not addressed by the ALJ compel a contrary result. Any attempt by the Law Division to resolve the merits of the DHS/CBVI regulatory obligation would not only subvert the responsibility and authority of the agency head to render the final agency decision, but ultimately would be squarely contrary to Rule 2:2-3, designating the Appellate Division of the Superior Court as the exclusive forum for reviewing such final agency actions or decisions. See also, Pascucci v. Vagott, 71 N.J. 40, 53, 362 A.2d 566 (1976) (exclusive jurisdiction to review final agency action vested in the Appellate Division even where it appears to have concurrent jurisdiction with a trial court).
Moreover, recent New Jersey decisional law has confirmed that disputes regarding the proper residential placement of developmentally disabled citizens should be processed as "contested cases" under the Administrative Procedure Act (APA) and resolved by the agency head after a trial-type hearing before an ALJ. Mr. & Mrs. J.E. on behalf of their son, G.E. v. State of New *283 Jersey, Etc., 131 N.J. 552, 568, 622 A.2d 227 (1993).[19] Accordingly, DHS's or CBVI's comparable responsibility, if any, for Laura's residential placement must be adjudicated in a like fashion, pursuant to the "contested case" jurisdiction of the OAL, with the final decision being reserved to the agency head.
Nor did the New Jersey Supreme Court intend to limit its holding or rationale in the G.E. case to those placement proceedings emanating from the substantive regulations of the DDD, as contrasted against, for example, the DHS or the CBVI. To the contrary, the language of its pronouncement appears purposely broad, encompassing "comparable" placement disputes arising from other agencies:
"[W]e conclude that placement challenges comparable to the proceeding before us should be regarded as essentially equivalent to `contested matters' under the APA.
* * * * * * * *
Eligible developmentally-disabled citizens are guaranteed by statute the most appropriate placement available that best can enhance their developmental potential in the least-restrictive environment. To provide adequate due-process protection of that right, placement disputes involving interests such as those presented by this appeal should be referred to the OAL for a trial-type hearing under the APA."
Id., at 568, 571, 622 A.2d 227 (emphasis added).
Unquestionably, Laura's residential placement dispute with the DHS/CBVI is "comparable" to that adjudicated in the G.E. case, and therefore constitutes a "contested case", mandating referral to the OAL. Consistent with the APA, an evidentiary hearing should be conducted by an ALJ, whose initial decision is subject to review and acceptance by the agency head. Pursuant to the procedural dictates of Rule 2:2-3, the "final" agency action is reviewable only by the Appellate Division of the Superior Court and not the Law Division. Accordingly, neither the CBVI nor the DHS may be compelled to participate in the pending proceeding.

*284 C. The Due Process Appeal

Consistent with controlling statutory and decisional law, it is the responsibility of the Law Division to render an independent judgment, giving "due weight" to the ALJ's findings, as to whether Laura's requested residential placement at Perkins is educationally necessary. The Board shall bear the burden of proving by a preponderance of the evidence that its contrary IEP is appropriate. See, Lascari, supra, 116 N.J. at 44, 560 A.2d 1180.
Although neither the DHS nor the CBVI can be compelled to participate in the due process appeal, Laura's parents may simultaneously seek to adjudicate their placement dispute with the DHS within the confines of the APA. If they elect to do so, in light of the fact that the "expedited" due process proceedings have already spanned in excess of ten months, an expedited referral to the OAL would seem appropriate and would reflect favorably on the DHS.

IV. Conclusion

Based upon the legislative history of the IDEA, the decisional law and the New Jersey Court Rules, neither the ALJ nor the Law Division may properly exercise jurisdiction in a "due process" proceeding over State agencies other than the DOE or the local school board. Accordingly, that portion of the ALJ's decision, purporting to order the DHS to pay Laura's room and board costs at the Perkins school, is vacated.
The due process appeal, presently pending in the Law Division, will proceed as between Laura (through her parents) and the Edison Board of Education in accordance with the substantive requirements of the IDEA. The Board will bear the burden of proving by a preponderance of the evidence the appropriateness of the individualized education program proposed for Laura. The court shall decide the merits of the appeal on the record established before the ALJ, along with such additional evidence as either party may properly elect to introduce.
*285 The State shall submit a form of order consistent with this opinion.
NOTES
[1] The regulations promulgated under the IDEA (and the official comment thereto) explicitly contemplate residential placement.

If placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child.
Comment. This requirement applies to placements which are made by public agencies for educational purposes, and includes placement in State-operated schools for the handicapped, such as a State school for the deaf or blind.
45 C.F.R. Sec. 121a.302. See also, Lascari v. Board of Educ., 116 N.J. 30, 36, 560 A.2d 1180 (1989).
[2] Although not directly relevant to the issues presented, the parties have all acknowledged the cost differential between the ten month/four night residential program at St. Joseph's and the twelve month, full time residential program at Perkins, is dramatic.
[3] The ALJ's conclusion that an entity other than the local school board was responsible for those expenses was apparently based upon his findings that Laura's residential placement "was not solely for educational reasons", but for reasons "beyond educational reasons" (emphasis added).
[4] See, 20 U.S.C.A. Sec. 1415(e)(2) (appeals to be taken "in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy"); and see, C.S. v. Middletown Township Board of Education, 259 N.J. Super. 340, 342-43, 613 A.2d 492 (App. Div. 1992) (State court of competent jurisdiction deemed to be the Law Division of the Superior Court, sitting without a jury).

While the instant proceeding was commenced by the State's filing of a Notice of Appeal, it is unclear whether that procedure is best suited to initiate the trial court's review. Section 1415(e)(2) authorizes an aggrieved party "to bring a civil action with respect to the complaint presented ...", perhaps suggesting something more akin to a proceeding in lieu of prerogative writ.
[5] See, 20 U.S.C.A. Sec. 1415(e)(2) ("In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court deems is appropriate"). See also, Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982) (court conducts an independent review, giving "due weight" to administrative agency); and see, Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 184 (3d Cir.1988), cert. denied, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989) (court must make substantive inquiry into whether proposed education program confers meaningful benefit to handicapped student).
[6] While the specifics of an appropriate education which the local educational agencies are obligated to provide as a condition of receiving federal grants are left primarily to State definition, Kruelle, supra, 642 F.2d at 691, the term "special education" includes "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction and instruction in hospital and institutions." 20 U.S.C.A. Sec. 1401(a)(16). "Related services" include "transportation, and such developmental, corrective, and other supportive services ... as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children." 20 U.S.C.A. Sec. 1401(a)(17).
[7] A "free appropriate public education" (FAPE) is defined as "special education and related services that have been provided at public expense, under public supervision and direction, and without charge." 20 U.S.C.A. Sec. 1401(a)(18).
[8] This is consistent with the Congressional intent that one state education agency be responsible for assuring that the requirements of the Act are carried out once that state has received federal funding. See 20 U.S.C.A. Sec. 1412(6); 34 C.F.R. Sec. 300.600; Senate Report No. 168, 94th Cong., 1st Sess. 24, reprinted in [1975] U.S. Code Cong. & Ad.News 1425, 1448. As noted in the Senate report:

"The Committee considers the establishment of single agency responsibility for assuring the right to education of all handicapped children of paramount importance. Without this requirement, there is an abdication of responsibility for the education of handicapped children ... While the Committee understands that different agencies may, in fact, deliver services, the responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency." [1975] U.S. Code Cong. & Ad.News at 1448; see also, Kruelle, supra, 642 F.2d at 696-97; Kerr Center Parent's Assoc. v. Charles, et als., 842 F.2d 1052, 1060-61 (9th Cir.1988).
[9] Obviously, the question of the jurisdictional reach of an ALJ in a special education/"due process" hearing is not necessarily dispositive of the Superior Court's authority in a subsequent evidentiary hearing conducted in the Law Division pursuant to the appeal provisions of the IDEA, an issue more fully discussed in Section III, infra.
[10] N.J.A.C. 1:1-17 involves the consolidation of cases and is not relevant to the disposition of the pending matter.
[11] See, N.J.S.A. 52:14B-10(c) authorizing the agency head to "adopt, reject or modify the recommended report and decision" of an ALJ. See also, N.J.S.A. 52:14F-7(a) providing that "nothing in this ... act shall be construed to deprive the head of any agency of the authority ... to determine whether a case is contested or to adopt, reject or modify the findings of fact and conclusions of any Administrative Law Judge." And see, N.J.S.A. 52:14F-8(b) providing that no ALJ shall hear a contested case in which the agency head has determined to conduct a hearing directly and individually.
[12] While it is true that the Legislature did intend, by creating the OAL, to bring impartiality, objectivity and independence to agency hearings, thus improving the overall quality of administrative adjudication, it never intended to alter the basic regulatory authority of the State agencies to decide contested cases. In re Uniform Rules, supra, 90 N.J. at 90-91, 447 A.2d 151.
[13] The Commission for the Blind and Visually Impaired is, for example, mandated to provide services to blind and visually impaired people in order to "ameliorate" their condition. See N.J.A.C. 10:91-1.7(b); see also, -2.2 (education services); -2.3 (vocational rehabilitation services); -2.6(a) (special instruction and/or related services to those individuals whose visual dysfunction impedes progress in school); -2.11 (eligibility standards for CBVI services); and see, N.J.A.C. 10:91-3.1 (financial responsibility of eligible recipients based on client's ability to pay for services).
[14] Although Laura's parents seek to distinguish several ALJ decisions supporting the State's position, notably, A.N. v. Clark Bd. of Ed., 6 N.J.A.R. 360 (1983), the determination made there, that neither the Department of Human Services nor any other State agency can be ordered by an ALJ to contribute towards educational costs in the context of a due process hearing, is essentially a sound one. As (then) Administrative Law Judge Lefelt concluded in the A.N. case, the mandatory joinder provisions of New Jersey Court Rule 4:28 are inapplicable to administrative proceedings conducted in the OAL. Rather, proceedings conducted in the OAL are governed by the Uniform Administrative Procedure Rules of Practice, consolidation provisions, of N.J.A.C. 1:1-14.1 et seq. Id. at 363.
[15] In Lascari, supra, 116 N.J. at 41, 560 A.2d 1180, plaintiffs appealed the denial of their request for reimbursement for tuition and residential expenses to the Superior Court, Chancery Division. While the Supreme Court noted that the administrative decision should be "reviewed by a court sitting without a jury," id. at 46, 560 A.2d 1180, the propriety of filing in Chancery as opposed to the Law Division was not addressed. Subsequently, the Appellate Division, in C.S. v. Middletown Township Board of Educ., supra, 259 N.J. Super. at 342-43, 613 A.2d 492, has held the Law Division to be the appropriate venue for filing such an appeal.
[16] Essentially, Rule 4:28-1 identifies those persons or entities whose joinder is desirable and necessary in order to grant full and complete relief to the parties already before the court, and provides in relevant part:

"A person ... shall be joined as a party to the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest in the subject of the action and is so situated that the disposition of the action in the person's absence may ... leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or other inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party".
[17] See, 20 U.S.C.A. Sec. 1412(6); and see note 8, supra and accompanying text.
[18] Rule 2:2-3 states in relevant part that:

"Appeals may be taken to the Appellate Division as of right ... (2) to review final decisions or actions of any state administrative agency or officer, and to review the validity of any rule promulgated by such agency or officer."
[19] After analyzing the procedures needed to protect the significant property interests at stake in a residential placement decision, the Supreme Court explained that a citizen's interest in a particular residential placement must be regarded as "essentially equivalent to `contested matters' under the APA." G.E., supra, slip opinion at 21.