34 A.3d 815

IN THE MATTER OF THE CIVIL COMMITMENT OF U.C.

Superior Court of New Jersey
Appellate Division

Argued December 12, 2011—Decided January 20, 2012.

602

Before Judges GRALL, ALVAREZ and SKILLMAN.

*Gerard Hughes,* Deputy Attorney General, argued the cause for appellant, New Jersey Department of Human Services, Division of Developmental Disabilities (*Paula T. Dow,* Attorney General, attorney; *Melissa H. Raksa,* Assistant Attorney General, of counsel; *Mr. Hughes,* on the briefs).

*William M. Ng,* Assistant Deputy Public Defender, argued the cause for respondent, U.C. (*Joseph E. Krakora,* Public Defender, attorney; *Mr. Ng,* on the brief).

*George M. Holland* argued the cause for respondent, I.C. (*Lentz & Gengaro,* attorneys; *Mr. Holland,* of counsel and on the brief).

*James R. Paganelli,* Essex County Counsel, attorney for respondent, Essex County, submitted a statement in lieu of brief (*Deanna V. Critchley,* Assistant Essex County Counsel, on the statement).

The opinion of the court was delivered by

SKILLMAN, J.A.D. (retired and temporarily assigned on recall).

The issue presented by this appeal is whether a trial court that has placed a developmentally disabled civil committee on "continued extension pending placement" (CEPP) status has the authority to order the Division of Developmental Disabilities (DDD) to fund that person's placement in a particular facility the court determines to be most appropriate. We conclude that the Legislature has delegated exclusive authority to the DDD to determine the appropriate placement of a developmentally disabled person eligible for its services. Therefore, a trial court that has placed a developmentally disabled person on CEPP status lacks authority

to override the DDD's determination of an appropriate residential placement for that person.

## I.

U.C. is a developmentally disabled person with an autistic disorder who received in-home services from the DDD for a substantial number of years. In early 2010, shortly before his eighteenth birthday, U.C. engaged in serious aggressive behavior towards his mother, grandmother, the driver of his school bus van, and other people in the community. Consequently, on February 6, 2010, U.C.'s mother, I.C., had him admitted into the "crisis intervention services unit" at the Trinitas Regional Medical Center.[1]

On February 22, 2010, I.C. wrote a letter to the DDD case worker assigned to U.C.'s case requesting his placement in a residential facility for the developmentally disabled. Her letter stated that U.C.'s aggression at home was "out of control" and that he "needs 24 hours of round the clock care in a residential home where he can live and go to school." I.C. suggested three facilities that would be appropriate for U.C., including Woods Services in Pennsylvania.

On March 4, 2010, the issue of U.C.'s need for continued commitment was brought before the trial court. Based upon a report submitted by the Trinitas medical staff in accordance with *Rule* 4:74–7(e), the court entered an order placing U.C. on CEPP status. This order also directed the DDD case worker assigned to U.C.'s case to appear at the next hearing to give testimony

---

[1] The parties' appendices do not include an application for U.C.'s involuntary commitment or an order of temporary commitment, as required by *Rule* 4:74–7A(b)(1) and (2). However, since a parent's voluntary admission of a minor for psychiatric evaluation or diagnosis may not continue for more than seven days, *see R.* 4:74–7A(d)(1), there presumably was an application for an involuntary civil commitment and a temporary commitment order that remained in effect until March 4, 2010.

regarding the DDD's efforts to secure a residential placement for U.C.

On March 18, 2010, following a placement review hearing attended by the case worker, the trial court entered an order continuing U.C.'s CEPP status. This order also directed the case worker's supervisor to appear at the next placement review hearing.

On April 1, 2010, following a placement review hearing attended by the supervisor, the trial court entered another order continuing U.C.'s CEPP status. By that date, U.C. had turned eighteen and become an adult. This order also directed a higher level DDD supervisor to appear at the next hearing "to appear on placement efforts for [U.C.]—in view of Woods School placement availability." [2]

On April 15, 2010, the court entered yet another order continuing U.C.'s CEPP status. This order also stated that the named DDD supervisors "shall be responsible for agency referrals given to advise acceptance or not by April 22nd."

On April 29, 2010, following another periodic review hearing, the court determined that it had the authority to order the DDD to fund U.C.'s placement in a residential facility selected by the court. The court also determined that Woods Services, which I.C. had suggested in her February 22nd letter to the DDD and a psychiatrist at Trinitas had recommended, was an appropriate placement for U.C. Accordingly, the court entered an order that provided:

> Patient now an adult and DDD having exhausted all New Jersey placement options and this court being satisfied his stay in this unit [within Trinitas] is inappropriate, inadequate and due to his age perhaps illegal, DDD is directed under their funding to make placement at the Woods School in Pennsylvania by May 6th or as soon thereafter as a bed is available.

---

[2] Woods Services was formerly called the Woods School. Woods Services, http://www.woods.org/php/services.programs/the-woods-schools.php (last visited Jan. 11, 2012).

On May 5, 2010, the DDD sent U.C. a letter, with a copy to I.C., which offered him an "emergency placement" at the Capitol Care group home in Franklin, New Jersey. This letter described the following circumstances warranting the emergency placement:

> You were admitted to Trinitas Hospital in February 2010 due to aggressive behaviors. Following your admission to Trinitas, your mother informed staff that you could not return home as she is no longer able to manage your behaviors. You are, therefore, homeless.

The letter also stated:

> The offer of an emergency placement at Capitol Care is intended to meet your basic needs for food, shelter and personal safety, as required by *N.J.A.C.* 10:46B–3.3(b).

Finally, the letter advised U.C. of his right to appeal under *N.J.A.C.* 10:46B–5.1 and *N.J.A.C.* 10:48 from the offer of emergency placement.

Following this offer, the DDD filed a motion for reconsideration of the court's April 29th order. The trial court conducted an evidentiary hearing regarding this motion on May 13, 2010, at which representatives of the DDD, a representative of Capitol Care, a psychiatrist employed by Trinitas, and I.C. testified. This testimony has only limited relevancy to our disposition of the appeal. Therefore, it is not discussed at this point in the opinion.

After the hearing, the trial court issued a brief oral opinion which concluded that the DDD's offer of emergency placement of U.C. at Capitol Care was "not appropriate" because it was not in any sense "reasonably comparable" to his proposed placement at Woods Services, and denied the DDD's motion. The court memorialized this ruling by an order entered on May 13, 2010, which stated:

> This court entered on April 29, 2010 an order and permitted DDD through counsel to reopen or reconsider such order. Full testimony was permitted by parent/legal guardian and [DDD]. Based on all of the evidence this court finds placement at the Woods School as soon as available is the only appropriate comparable placement alternative. DDD may continue to explore appropriate in state placement therefore and thereafter as they determine.

The DDD requested a stay pending appeal, which the trial court denied. U.C. was subsequently placed at Woods Services in

conformity with the court's April 29th and May 13th orders. This placement costs the DDD $132,320 annually.[3]

## II.

■ Before considering whether a trial court has the authority to order the DDD to place a developmentally disabled person on CEPP status in a particular facility the court determines to be most appropriate, we address I.C.'s argument that this appeal is moot. I.C. argues that the DDD acquiesced in U.C.'s placement at Woods Services by completing the paperwork required for this placement and failing to take any steps to find an alternative long-term placement.

However, the trial court ordered the DDD to place U.C. at Woods Services and denied the DDD's motion for a stay pending appeal. Although the April 29th and May 13th orders preserved the DDD's right to "continue to explore appropriate in-state placement," the DDD could reasonably have expected that any determination it made concerning an "appropriate" in-state placement would be subject to the same form of review by the trial court as its determination that Capitol Care was an appropriate emergency placement. The DDD's appellate brief unequivocally states that it has "funded U.C.'s placement at Woods only because it was ordered to do so by the commitment court[,]" and that at no point did it "agree to permanently fund U.C.'s placement as it continues to appeal the commitment court's order." Moreover, the DDD represents that if it prevails in this appeal, "it will work with U.C. to secure suitable services in accordance with its regulations[,]" which presumably will result in a placement at a facility other than Woods. Under these circumstances, this appeal is not moot.

Furthermore, even if the record indicated that the DDD intends to continue U.C.'s placement at Woods Services in light of the fact

---

[3] This sum does not include the cost of U.C.'s educational services, which are funded separately by his local school district.

he has now been a resident of that facility for more than a year-and-a-half, we would conclude that this appeal was not moot. U.C. became a resident of Woods rather than Capitol Care only because the trial court so ordered. The DDD represents that other commitment courts have entered similar orders, and therefore, this appeal presents a "significant and recurring" issue that needs to be resolved to "provide guidance in future commitment hearings." Our courts have recognized that even if a controversy becomes moot during the pendency of an appeal, it nevertheless may be appropriate to decide the appeal if the issue it presents is of substantial importance and capable of repetition yet evading review. *See In re Commitment of N.N.,* 146 *N.J.* 112, 124, 679 *A.*2d 1174 (1996); *In re Commitment of M.C.,* 385 *N.J.Super.* 151, 155–56, 896 *A.*2d 495 (App.Div.2006). This is such an appeal.

### III.

The starting point in deciding whether a trial court that has placed a developmentally disabled civil committee on CEPP status has the authority to order the DDD to fund that person's placement in a facility the court has determined to be most appropriate is the statutory sections governing the DDD's provision of services. *N.J.S.A.* 30:4–25.1 to –25.9. *N.J.S.A.* 30:4–25.2 states that any party listed in that section, including a developmentally disabled person's "parent or guardian" and "any court of competent jurisdiction in which the issue of mental deficiency may have arisen," may apply to the Commissioner of Human Services[4] to provide functional services for a developmentally disabled person. *N.J.S.A.* 30:4–25.3 requires the Commissioner to make a prompt determination of eligibility for such services. *N.J.S.A.* 30:4–25.6 provides that the Commissioner shall provide an eligible developmentally disabled person "with appropriate functional services to the extent available." Such functional services include

---

[4] The DDD is a division in the Department of Human Services. *N.J.S.A.* 30:6D–24.

"both residential and nonresidential." *N.J.S.A.* 30:4–165.2. *N.J.S.A.* 30:4–25.6 also provides that "[i]n the event that the functional service which has been specified as most appropriate ... is not immediately available, the commissioner shall provide alternate service and, at the request of the applicant, shall also place the eligible person on a waiting list for the preferred service pending its availability."

Under these statutory provisions, "the decision as to the type and availability of services that any DDD client receives is ... allocated to the Commissioner." *Rosen v. N.J. Div. of Developmental Disabilities,* 256 *N.J.Super.* 629, 641, 607 *A.*2d 1030 (App.Div.1992), *certif. denied,* 133 *N.J.* 440, 627 *A.*2d 1145 (1993). In exercising this statutorily delegated authority, the "DDD is faced with the daunting and unenviable task of attempting to provide for a large number of clients with inadequate funding for placement of all those in need of service." *J.D. ex rel. D.D.H. v. N.J. Div. of Developmental Disabilities,* 329 *N.J.Super.* 516, 522, 748 *A.*2d 613 (App.Div.2000). "In order to establish standards and criteria for the placement of eligible persons, DDD has promulgated a comprehensive set of regulations providing guidelines for placement." *Ibid.; see N.J.A.C.* 10:46B–1.1 to –5.1; *N.J.A.C.* 10:46C–1.1 to –1.6.

These regulations recognize that although "families provide care for most individuals with developmental disabilities[,]" *N.J.A.C.* 10:46B–2.1(a), "not all families or caregivers can provide the individual with a living arrangement[,]" *N.J.A.C.* 10:46B–2.1(c). If a family is unable to care for a developmentally disabled person in its home, the DDD undertakes, within the limits of its funding, to place the person in a residential facility outside the home. *N.J.A.C.* 10:46B–3.1(c). However, this funding is insufficient to place all developmentally disabled persons who are in need of a residential facility. Consequently, most residential placements are made from waiting lists established under the rules set forth in

*N.J.A.C.* 10:46C–1.4.[5]

However, in an emergency, a developmentally disabled person may be placed in a residential facility ahead of those on the waiting lists. *N.J.A.C.* 10:46B–3.2(a); *N.J.A.C.* 10:46B–3.3. "An emergency need for services or placement shall be deemed established when the person is homeless or in imminent peril, as defined in [*N.J.A.C.* 10:46B–1.3]." *N.J.A.C.* 10:46B–3.3(a). "Emergency services shall meet the individual's basic needs." *N.J.A.C.* 10:46B–3.3(b).

The DDD determined in its May 5, 2010 letter to U.C. that he was "homeless" because I.C. could no longer care for him at home and that he thus qualified for an emergency placement. The DDD also determined that U.C.'s residential placement at Capitol Care would provide his "basic needs for food, shelter and personal safety," as required by *N.J.A.C.* 10:46B–3.3(b).

If an applicant disputes a DDD decision regarding placement, such as the decision reflected in the DDD's May 5th letter to U.C., the applicant is entitled to a "trial-type hearing before the Office of Administrative Law [OAL]." *J.E. ex rel. G.E. v. State, Dep't of Human Servs.,* 131 *N.J.* 552, 560–69, 622 *A.*2d 227 (1993); *see N.J.A.C.* 10:48–7.1. If the applicant disagrees with the DDD's final decision following that hearing, the applicant may appeal to this court. *R.* 2:2–3(a)(2). Thus, the DDD's exercise of its statutorily delegated authority to make a residential placement decision regarding a developmentally disabled person is subject to the same type of review by administrative hearing before the OAL and appeal to this court as any other decision by a State administrative agency.

It is clear from the statutory sections governing the DDD's provision of services to developmentally disabled persons that the Legislature has delegated exclusive authority to the DDD to determine the appropriate placement of such persons. There is

---

[5] The testimony before the trial court indicated that a residential placement from a waiting list may take as long as ten years.

no statutory authorization for any other agency or a court to make a placement decision or to override the DDD's placement decision. Moreover, the decisions of the Supreme Court and this court reviewing final placement decisions by the DDD all proceed on the implicit premise that the DDD has exclusive authority to make placement decisions, subject to appellate review. *See, e.g., P.F. v. N.J. Div. of Developmental Disabilities,* 139 *N.J.* 522, 529–31, 656 *A.*2d 1 (1995); *J.E., supra,* 131 *N.J.* at 564–67, 622 *A.*2d 227; *Rosen, supra,* 256 *N.J.Super.* at 641–45, 607 *A.*2d 1030. Indeed, the Court in *J.E.* described the administrative appeals procedure, including the right to a hearing before the OAL recognized in that case, as the "only opportunity" a developmentally disabled person or family member has to challenge a DDD placement decision. 131 *N.J.* at 567, 622 *A.*2d 227.

Notwithstanding the Legislature's delegation of exclusive authority to the DDD to determine the placement of developmentally disabled persons, the trial court concluded that a court that has placed a developmentally disabled civil committee on CEPP status may order the DDD to fund the placement of that person in a particular residential facility. We reject this conclusion and hold that a court conducting a civil commitment proceeding lacks the authority to override the DDD's determination regarding the residential placement of a developmentally disabled person.

A trial court's exercise of authority in a civil commitment proceeding is governed by the statutory sections relating to civil commitments. *See N.J.S.A.* 30:4–27.1 to –27.23.[6] Under these sections, a court's authority is limited to determining whether a person should be involuntarily committed to a psychiatric hospital, *N.J.S.A.* 30:4–27.10; *N.J.S.A.* 30:4–27.12; *N.J.S.A.* 30:4–27.14; *N.J.S.A.* 30:4–27.15(a)(b), and thereafter, whether that person's commitment should be continued or the person should be dis-

---

[6] These provisions have been implemented by court rules that set forth procedures for the conduct of civil commitment proceedings. *R.* 4:74–7 (adults); *R.* 4:74–7A (minors).

charged, with or without conditions. *See N.J.S.A.* 30:4–27.15(c); *N.J.S.A.* 30:4–27.17. In addition, under *In re S.L.*, 94 *N.J.* 128, 140–42, 462 *A.*2d 1252 (1983), if the court concludes it has no authority to continue a civil commitment because the person no longer poses a danger to self or others or property by reason of mental illness, but is unable to survive in the community independently or with the help of family or friends, it may continue the former committee's confinement within the institution in the environment least restrictive of liberty to protect his or her essential well-being, while efforts are made to seek an appropriate placement outside the institution. *See also In re Commitment of M.C., supra,* 385 *N.J.Super.* at 161–63, 896 *A.*2d 495.

However, there is no authorization in these statutory provisions for a trial court to order an agency within the Department of Human Services such as the DDD to place a civil committee or former civil committee discharged on conditions or placed on CEPP status in a particular residential facility. Rather, all of the pertinent statutory provisions indicate that the Legislature has delegated exclusive authority to the Commissioner of Human Services to determine appropriate placements in State institutions and the funding of placements in non-State institutions. The statutory sections governing civil commitments include *N.J.S.A.* 30:4–27.21(a) and (b), which confer authority upon the Commissioner to transfer a person committed to a State psychiatric facility either to another State psychiatric facility or to a non-State facility. In addition, pertinent to this appeal, *N.J.S.A.* 30:4–27.21(c) provides that if a developmentally disabled person residing in a State development center or other residential placement is committed involuntarily, "the physical transfer of the developmentally disabled person from the development center or other residential functional services placement to a State or county psychiatric facility and from the facility back to the developmental center or other residential functional services placement shall be on a two-way commissioner's order of transfer." Therefore, the statutory sections governing civil commitments reinforce our conclusion, derived primarily from the statutory sections governing the

provision of services by DDD, that the Legislature has delegated exclusive authority to the Commissioner of Human Services to determine appropriate services for developmentally disabled persons, including residential services, which may not be overridden by a trial court presiding over a civil commitment proceeding.

In arguing that the trial court had the authority to compel the DDD to fund his placement at Woods Services, U.C. relies primarily upon *In re S.L., supra,* 94 *N.J.* 128, 462 *A.*2d 1252. However, the Court in *S.L.* recognized that one of the critical factors a court must consider in a placement review hearing is the "availability" of a placement that will provide the former committee with necessary "custodial and supportive care." 94 *N.J.* at 140–41, 462 *A.*2d 1252. The Court indicated that "[i]n the event that placement can be arranged in a facility able to provide the care needed in a setting not unduly restrictive of liberty, the court shall order such placement." *Id.* at 141, 462 *A.*2d 1252. In this case, the DDD concluded that Capitol Care could provide such custodial and supportive care for U.C. The trial court had the authority under statutory sections governing civil commitments and *S.L.* to determine whether Capitol Care could in fact provide this care. However, the trial court had no authority, if it found placement at Capitol Care inappropriate, to order the DDD to fund U.C.'s placement at Woods Services. Instead, as in any other placement review hearing in which a court determines that "immediate placement is not possible," the trial court should have "continue[d] [U.C.'s] confinement, required[d] [U.C.] be placed in the environment least restrictive of his ... liberty within the institution, and schedule[d] a subsequent placement review hearing to occur within six months." [7] *Ibid.*

As support for the trial court's decision, U.C. also relies upon a decision by a panel of this court that characterized the perform-

---

[7] The court also could have conditionally approved U.C.'s placement at Capitol Care, subject to his right to seek review of the DDD's placement decision by a hearing before the OAL in accordance with *N.J.A.C.* 10:46B–5.1 and *N.J.A.C.* 10:48–7.1.

ance by the DDD's predecessor agency of its statutory duties regarding the type of services required by a developmentally disabled person as "ministerial." *In re Commitment of B.R.*, 202 *N.J.Super.* 182, 187, 494 *A.*2d 333 (App.Div.1985). However, whether or not this was a proper characterization of the services involved in *B.R.*, there was nothing ministerial about the DDD's decision to reject U.C.'s proposed placement at Woods Services and instead offer him an emergency placement at Capitol Care. A public official's performance of a statutory responsibility is considered ministerial only if it is "so plain in point of law and so clear in matter of fact that no element of discretion is left as to the precise mode of [its] performance." *Switz v. Twp. of Middletown,* 23 *N.J.* 580, 588, 130 *A.*2d 15 (1957). The record developed at the evidentiary hearing in this case and the trial court's opinion clearly demonstrate that the appropriateness of the DDD's proposed placement of U.C. in Capitol Care involved factual issues and the DDD's exercise of discretion. *See S.I. v. N.J. Div. of Developmental Disabilities,* 265 *N.J.Super.* 251, 263–65, 626 *A.*2d 466 (App.Div.1993). Therefore, this decision was not ministerial.

Our conclusion that the trial court lacked the authority to override the DDD's determination that U.C. should be placed in Capitol Care and instead order the DDD to fund his placement at Woods Services is supported by *In re Patterson & Bohuk,* 156 *N.J.Super.* 91, 383 *A.*2d 467 (App.Div.), *certif. denied,* 77 *N.J.* 469, 391 *A.*2d 484 (1978). In that case, a trial court ordered the transfer of two prison inmates who had been committed to a maximum security psychiatric facility to a minimum security psychiatric facility based on their statutory right to treatment under the least restrictive conditions. We reversed that order, concluding, based on our review of the statutory sections governing civil commitments and the Commissioner of Human Services' administration of the State's mental health system, that the Legislature had delegated exclusive authority to the Commissioner to determine the State mental health facility in which a civil committee-inmate should be confined. *Id.* at 94–99, 383 *A.*2d 467. In reaching this conclusion, we stated:

> [T]he Legislature intended the Commissioner to have power to determine where a convicted inmate-patient will be assigned within the system and when the patient should be transferred. We think it unlikely that the Legislature intended to repose a concurrent transfer and placement power in the many ... judges hearing ... commitment cases ... involving convicted and sentenced prisoners. The statutory scheme contemplates a fundamental distinction between commitment in contrast to placement and treatment. Commitment is properly a judicial function, but questions of placement and transfers within the system are the Commissioner's responsibility.
>
> [*Id.* at 97, 383 *A.*2d 467.]

Similarly, we conclude based on our review of the statutory sections governing civil commitments and the provision of services by the DDD that, although determinations of whether a developmentally disabled person should continue to be committed, discharged with or without conditions, or placed on CEPP status, and whether, if placed on CEPP status, a proposed placement provides the needed custodial and supportive care, are properly judicial functions, any question regarding the proper placement of a developmentally disabled person eligible for the services provided by the DDD, including one on CEPP status, is within the Commissioner's exclusive authority, subject to administrative review through a hearing before the OAL and judicial review by appeal to this court.

Accordingly, the April 29 and May 13, 2010 orders of the trial court are reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.[8]

---

[8] U.C. or I.C. may of course appeal to this court from any final decision of the DDD regarding either an emergency or permanent placement of U.C. at Capitol Care or another facility.